# JACOB RUPPERT, A CORPORATION, *v.* CAFFEY, UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK, ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 603. Argued November 20, 21; 1919.—Decided January 5, 1920.

The War-Time Prohibition Act was within the war power of Congress when passed and had neither become invalid by change of circumstances nor expired by its own terms when this suit was begun. P. 281. *Hamilton* v. *Kentucky Distilleries & Warehouse Co., ante,* 146.

For the same reasons, Congress had power to enact new prohibitions at the time when the National Prohibition Act, *infra,* was passed. P. 282.

The National Prohibition Act (October 28, 1919, Title I, § 1) in its provision that "The words 'beer, wine, or other intoxicating malt or vinous liquors' in the War Prohibition Act shall be hereafter construed to mean any such beverages which contain one-half of 1 per centum or more of alcohol by volume," *held* constitutional. P. 282.

As a measure reasonably necessary to make the prohibition of intoxicating liquors effectual, Congress in the exercise of the war power may prohibit those containing as much as one-half of 1 per cent. by volume of alcohol, even though they be not in fact intoxicating. *Id.*

The argument that power to prohibit non-intoxicating liquors is merely an incident to the power to prohibit intoxicating liquors, implied from clause 18, § 8, of Art. I, of the Constitution, and cannot be upheld, because one implied power cannot be grafted upon another, is merely a matter of words, since, rightly understood, the power in question is a single, broad power; not merely to prohibit but to prevent the liquor traffic, like the police power of the States as applied to the same subject. P. 299.

Some confusion of thought might perhaps have been avoided, if, instead of distinguishing between powers by the term express and implied, the term specific and general had been used; for the power conferred by clause 18, § 8, of Art. I, "to make all laws which shall be necessary and proper for carrying into execution" powers specifically granted, is itself an express power. P. 300.

The fact that the above-cited provision of the National Prohibition Act entails peculiar hardship and loss to owners of breweries and manufactured beer by becoming effective immediately upon its passage, does not render it arbitrary and unreasonable. P. 301.

Such immediate prohibition did not amount to a taking of the non-intoxicating beer previously acquired, for which compensation must be made. P. 302.

The action of the President, under the Food Control Act, in at first permitting the production of malt liquors containing not more than 2.75 per cent. of alcohol, in next extending the prohibition to all malt liquors for beverage purposes irrespective of alcoholic content, and in afterwards limiting the prohibition to intoxicating malt liquors, *held,* not to import a finding that 2.75 per cent. beer is non-intoxicating or to raise any equity in favor of an owner of beer manufactured after the President's authority over the subject had ceased. P. 303.

Affirmed.

THE case is stated in the opinion.

*Mr. Elihu Root* and *Mr. William D. Guthrie,* with whom *Mr. William L. Marbury* was on the briefs, for appellant:

The war powers of the United States are complete and sufficient for all war purposes and comprehend the right to employ any appropriate means found necessary and proper for prosecuting a war and plainly adapted to that end. *Selective Draft Law Cases,* 245 U. S. 366, 377; *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135, 149; *Salamandra Ins. Co.* v. *N. Y. Life Insurance & Trust Co.,* 254 Fed. Rep. 852, 858. Those powers, however, are clearly divided between Congress and the President. All the executive power exercisable in connection with the waging or conducting of war is vested exclusively in the President by virtue, not only of his office as President, but of his powers as Commander-in-chief. *Ex parte Milligan,* 4 Wall. 2, 139.

It may be conceded that whilst war was being actually waged between April, 1917, and November, 1918, and whilst the country continued on a war-footing with the army and navy not yet demobilized, Congress could, if

necessary and proper for the prosecution of the war while raging, or the support of the army and maintenance of the navy pending demobilization, prohibit the use and consumption of food products in the manufacture of beverages, whether or not intoxicating, and prohibit the manufacture, sale and use of intoxicating liquors. But it is urged that any such incidental war power of prohibition, which would necessarily interfere with the liberties and property rights of the people of the United States and the governmental powers reserved to the several States, can be exercised only in cases of existing war emergency or military necessity. In other words, the rights of the States cannot be even temporarily violated unless a war emergency reasonably warrants such action. This follows from the very nature of our federal system and the duty of Congress and the President not to violate the express reservations of powers to the States, embodied in the Tenth Amendment to the Constitution of the United States, or the constitutional rights of the individual. *Hammer* v. *Dagenhart*, 247 U. S. 251, 273, 276; *Keller* v. *United States*, 213 U. S. 138, 144; *Vance* v. *Vandercook Co.*, 170 U. S. 438, 444; *Kidd* v. *Pearson*, 128 U. S. 1, 24;— *McCulloch* v. *Maryland*, 4 Wheat. 316. 405; *Houston* v. *Moore*, 5 Wheat. 1, 48.

The business of brewing beer is authorized licensed and regulated in a number of the States, as in the State of New York, and any legislation of Congress prohibiting the manufacture and sale of beer must necessarily operate to override state policy and authority and state legislation, as well as to deprive many States of a present source of large revenue from taxation necessary for the support and maintenance of their respective state governments. In the State of New York alone, such annual revenue amounted in 1916 to over $21,000,000, in 1917 to over $20,700,000 and in 1918 to over $22,500,000.

Hundreds of millions of dollars are invested in the

brewing business and to many thousands of citizens it is their only means of livelihood. The rights of all engaged in such a business, heretofore always expressly authorized and licensed by both federal and state governments, ought not to be subject to selection for violation and destruction under the pretext of the exercise of the war powers of Congress at a time when no actual war emergency or military necessity calls for any such prohibition, and when no other class in the Nation is being subjected to any such prohibition or discrimination or called upon to make any such contribution or sacrifice to the common welfare on any plea whatever. On behalf of the brewers, whose property and business are now threatened with destruction long before the Eighteenth Amendment will become effective as the source of any additional power to Congress or as a limitation upon the reserved rights of the States and their peoples, it is submitted that the rights and liberties guaranteed by the Constitution are not suspended and do not cease to be effective guarantees during a period of war, and are not subject to denial or curtailment by war measures, whether by the Congress or the President, unless an actual war emergency or military necessity so requires, and then only during the period of such war emergency or military necessity. *Mitchell* v. *Harmony,* 13 How. 115, 149; *Ex parte Milligan,* 4 Wall. 2, 121; *Raymond* v. *Thomas,* 91 U. S. 712, 716.

It was undoubtedly the intention of the framers of the Constitution to vest in the President the broadest war powers, and to render him independent of Congress in respect of the exercise of those powers in the actual conduct of a war. Hamilton, The Federalist, No. 74, Ford's ed., p. 496; Kent's Comm., vol. 1, p. 282; Story on the Constitution, § 149; Pomeroy, Constitutional Law, §§ 703–714; Von Holst's Constitutional Law (Mason's translation), pp. 164, 192–195. His powers are here emphasized because he is peculiarly qualified under the Constitution

to determine such questions as the existence or continuance of a war emergency or military necessity, and his official declarations upon such a subject, in the absence of other criteria, furnish the best evidence which the nature of the case permits, and in the absence of all other evidence are conclusive.

The existence of a war emergency must be the basis and warrant for the exercise of an implied war power, which tends to deny the rights of an individual or a State, and the courts are not concluded by the mere declaration of Congress, whether express or implied, that such an emergency actually exists, or shall be presumed to continue for some indefinite period in the future. *Ex parte Milligan*, 4 Wall. 2; Willoughby, Constitutional Law, vol. 2, p. 1251.

The ruling and doctrine of the *Milligan Case* have never been questioned by the court. With entire uniformity the authorities have laid down and applied the rule of actual necessity or emergency as the test of the authority of the Congress or the President to exercise any incidental war power in derogation of the constitutional rights of the citizen. *Mitchell* v. *Harmony*, 13 How. 115, 135; *Raymond* v. *Thomas*, 91 U. S. 712, 716; *Milligan* v. *Hovey*, 3 Biss. 13; *In re Egan*, 5 Blatchf. 319; *Mc-Laughlin* v. *Green*, 50 Mississippi, 453; *Johnson* v. *Jones*. 44 Illinois, 142, 154; *Griffin* v. *Wilcox*, 21 Indiana, 370; *Nance & Mays* v. *Brown*, 71 W. Va. 519, 524; *United States* v. *Hicks*, 256 Fed. Rep. 707; *Legal Tender Cases*, 12 Wall. 457, 540.

To argue that the war with Germany and Austria is not yet legally and formally terminated does not meet the point at all. The existence of actual war emergency and not mere *de jure* war is the controlling test of the right to deny the constitutional rights of citizens of the United States. That is clearly the doctrine of the *Milligan Case*. The mere fact that a *de jure* state of war still exists

would not warrant the subversion of state rights or constitutional immunities, if there be as matter of fact no actual war emergency.

The cases which hold that, strictly and legally speaking, the war will not be terminated until a treaty of peace is ratified, mostly deal with such matters as the statute of limitations or the rights of aliens. Of course, an alien enemy ordinarily cannot sue until peace has been formally restored, and, therefore, the running of the statute is suspended in the meanwhile; but such precedents have no bearing upon the question here under discussion.

The contention of the Government seems to be that the right of Congress to exert its war powers is absolute, that the question as to what particular measures are necessary is committed wholly to the discretion of Congress and that the judgment of Congress when expressed is not subject to review by the courts. It is submitted that this contention is clearly in conflict with the fundamental doctrine upon which this court has uniformly proceeded ever since the decision in *Marbury* v. *Madison*, 1 Cranch, 137, and that it has long been settled that Congress is never the sole judge of the extent of its powers or of the existence of jurisdictional facts authorizing its action. It must be borne in mind that practically all the war powers of Congress, such as to raise and support armies and to provide and maintain a navy, exist and must be exercised in times of peace as well as war. These powers are expressly delegated and not limited to war times. But the incidental or implied powers are *expressly* limited to those "which shall be necessary and proper for carrying into execution" the delegated powers, and Congress is never the sole judge of their appropriateness. The contention of the Government is fully refuted by the reasoning of Mr. Chief Justice Chase in *Hepburn* v. *Griswold*, 8 Wall. 603, 617.

The present contention on behalf of the Government

is, in final analysis, that the assumption by Congress of a power to prohibit intoxicating and non-intoxicating beverages during a technical state of war is absolutely conclusive and precludes any inquiry by the courts as to the conditions actually existing when the acts in question were passed as alleged war measures, or when they are sought to be enforced against the individual. If sound, this view would vest in Congress as well as in the President the broadest autocratic and despotic war powers, as soon as a technical state of war arose.

But it should be manifest that during the existence of a state of war neither Congress nor the President becomes vested. *ipso. facto* with unlimited and despotic power throughout the United States, where no actual hostilities are being conducted, and that neither branch of the Government becomes the sole judge of the appropriateness of any means it may determine to be necessary and proper as a war measure. Otherwise, the moment a nominal or legal state of war arose, although without actual hostilities or very limited hostilities (as in the case of the war at sea with France in 1798 or with Tripoli in 1801), the Congress and the President would at once become vested with unlimited despotic powers to determine arbitrarily what means were necessary and proper, which would mean that during the existence of any period of war (and even as the Government suggested on the oral argument below during the period of all aftermaths of the war) Congress and the President in their several departments would be vested with such autocratic and despotic powers that the people of the United States would be quite at their mercy.

Fortunately, no such doctrine has ever been tolerated by this court. On the contrary, ever since the great case of *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, the assumption of power by Congress or the Executive has never been held to be conclusive. The controlling judicial

inquiry always has been recognized to be whether the end in view is or is not legitimate at the time of the passage and enforcement of an act of Congress; whether it is or is not an appropriate means to such a legitimate end, and whether it is or is not then plainly adapted to that end.

Furthermore, the constitutionality of any statute, whether criminal or not, must be determined as of the time and in the light of the circumstances existing when it is sought to be enforced against the individual. *Castle v. Mason,* 91 Oh. St. 296, 303. The justiciable question always is whether or not a statute sought to be applied in a particular case against a person complaining or defending, does or does not violate the constitutional rights of that person at the time its terms and provisions are attempted to be enforced. The rate cases furnish a striking example and analogy. *Lincoln Gas & Electric Light Co.* v. *Lincoln,* 250 U. S. 256, 269; *Minnesota Rate Cases,* 230 U. S. 352, 473; *Missouri Rate Cases, ib.* 474, 508; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 18; *Willcox* v. *Consolidated Gas Co., ib.* 19, 54; and particularly *Municipal Gas Co.* v. *Public Service Comm.,* 225 N. Y. 89, 95, 97. This court recognized the principle now being urged in *Johnson* v. *Gearlds,* 234 U. S. 422, 446, and *Perrin* v. *United States,* 232 U. S. 478, 486.

The question before the court is, therefore, solely this: Is there *now* such actual war emergency or necessity in this country as would in any reasonable aspect warrant the enforcement of the new and extensive prohibitions contained in the Act of October 28, 1919? The President has emphatically and unequivocally answered this inquiry in the negative in his messages to Congress of May 20th and October 27th. And Congress itself in the very act now before the court has recognized that the war is practically concluded by referring thereto in § 38 of title II as "the recent war."

In all the cases heretofore cited in support of war legislation, the legislation was warranted as of the date when it was operative and sought to be enforced. But none of them intimated that a person might be deprived of his liberty or property at some future date under the exercise of the war power, notwithstanding the fact that no actual war necessity for the sacrifice or denial of his constitutional rights might as matter of fact then exist.

The cases of *Northern Pacific Ry. Co.* v. *North Dakota*, 250 U. S. 135; *Dakota Central Telephone Co.* v. *South Dakota, ibid.* 163; *Burleson* v. *Dempcy, ibid.* 191; *MacLeod* v. *New England Telephone & Telegraph Co., ibid.* 195; and *Commercial Cable Co.* v. *Burleson,* 255 Fed. Rep. 99, *s. c.,* 250 U. S. 360, in no way sustain the proposition that any implied declaration by Congress would be conclusive as to the existence of a present necessity justifying the prohibitions in question.

The justiciable question as to the existence or continuance of a war emergency presents, it is true, a very high and delicate matter of public law and may as such involve grave difficulties of proof. In the absence of satisfactory evidence, the court might decline to hold that Congress had acted without authority in view of the continuance of a *de jure* state of war until a treaty of peace has been formally ratified. But the case at bar involves no such difficulty of proof because the President himself has in effect proclaimed in his veto message of October 27, 1919, and in other declarations that the war emergencies, which alone could uphold the prohibition legislation now in question, no longer exist.

In view of the war powers and responsibilities of the President and his express duty to inform Congress as to the state of the Union, it must be clear that it is especially fit and proper that he should determine officially as to the existence or continuance of a war emergency, and

that, in the absence of other proof, his declarations as to this question of fact of actual date and condition should be deemed the best evidence and the most certain criteria. It involves a matter peculiarly within his knowledge and jurisdiction, and in such a matter the decision of the President, as Executive and Commander-in-chief, ought to be accepted as conclusive in the absence of any other proof or criteria.

If it be urged again by the Government that the question whether a war emergency exists or continues is in great measure a political question, to be conclusively determined by the political branch of the Government, surely it is none the less political and conclusive when it is decided by the President, and *a fortiori* so when there is no evidence either before Congress or the courts to the contrary of, or in any way impeaching, his finding.

Some of the reasons for attributing the greatest weight to the declarations of the President as to the actual state of the country, in war as well as in peace, are stated by Mr. Justice Story in his Commentaries, § 1561. And see *Martin* v. *Mott*, 12 Wheat. 19; *Luther* v. *Borden*, 7 How. 144; *Prize Cases*, 2 Black, 635; *The Protector*, 12 Wall. 700, 702.

It would present a very strange anomaly if it were to be held that notwithstanding the solemn official declarations of the President, in respect of a matter peculiarly within his knowledge and jurisdiction, to the effect that a particular war emergency no longer existed calling for or justifying prohibition, the Congress could nevertheless disregard his findings and proceed to enact legislation based upon the assumption of a contrary state of facts.

The condition of the Act of November 21, 1918, has been satisfied.

The President has sufficiently proclaimed the conclusion of the war and demobilization.

The Act of November 21, 1918, had been judicially interpreted by ten United States District Courts to include only intoxicating beverages; the Act of October 28, 1919, provides that *hereafter* the prohibition shall be construed to mean such beverages which contain one-half of one percentum or more of alcohol. It cannot, of course, operate to overthrow the decisions of the courts as to the true construction of the prior act, or apply to alleged offenses committed before the passage of the new act. *Jaehne* v. *New York*, 128 U. S. 189.

Therefore, the controlling question in the case at bar is whether on October 28, 1919, such a war condition or emergency existed as would constitutionally warrant the exercise of the war powers of Congress in derogation or destruction of the constitutional and property rights of the complainant and other brewers of the United States. The act establishes a new and different rule for the future, and thus what has heretofore been wholly lawful is "hereafter" to be a crime. Harmless beverages which were freely and legally manufactured and sold while the war was at its height and while the Act of November 21, 1918, was alone in effect, are now declared to be prohibited and their value as property to be destroyed, and that too as a war measure! New and most drastic punishments are provided for the new offenses created.

The language of the Eighteenth Amendment presents a very grave question as to the power of Congress to enact prohibition legislation effective before the expiration of one year from the ratification of that Amendment.

Congress and the people of the United States, who proposed and adopted this Amendment in war time, clearly intended that the power to prohibit intoxicating liquors should not be exercised by Congress until the expiration of one year from ratification. They appreciated that the Amendment meant the destruction of large industries worth hundreds of millions of dollars without any com-

pensation at all and the means of livelihood of thousands of persons, as well as the withdrawal from the States of a source of large revenue. Accordingly, they decreed by express constitutional provision that there should be one year of grace in order to serve practically in lieu of compensation, and to give those engaged in the industries affected a fair and reasonable opportunity to wind up their businesses, adjust and liquidate their affairs, and find new occupations with a minimum of hardship and social dislocation, and to enable States and municipalities to accommodate and readjust their fiscal systems to the new order. Cong. Rec., December 17, 1917, p. 432.

Even if the war were still active and flagrant, the provision of the Amendment, adopted during war times, should limit and qualify any implied war power in derogation thereof, and certainly so as to emergencies which existed when the Amendment was proposed and adopted. No implied war power to ban both intoxicants and nonintoxicants should be held to exist at the present time in the very face of the fact that the constitutional amendment itself expressly deferred the prohibition for one year and impliedly guaranteed to all those engaged in the business of manufacturing and selling intoxicating liquors that they should meanwhile remain unmolested, so far as the exercise of federal power of prohibition was concerned, until the expiration of one year from the date of ratification. It is in effect proposed to add to the Amendment a proviso authorizing Congress to deny any time of grace if deemed necessary and proper as a war measure!

It does not follow that the Government would have been disabled from meeting new emergencies of war if they had arisen after the ratification of this Amendment. Congress could always authorize condemnation of whatever food products or other property might be needed for war purposes, or ration the food of the country, or, in the exercise of its powers to make rules for the army

and navy, forbid liquor to be sold to soldiers and sailors, etc. Only general federal prohibition was impliedly forbidden during the year of grace.

Even if Congress in the exercise of its war powers could prohibit the manufacture and sale of intoxicating liquors, it could not prohibit the manufacture and sale of beverages which are indisputably and concededly non-intoxicating. Any such stretch of legislation, if upheld as incidental to any incidental war power of Congress to prohibit intoxicating liquors, would carry the incidental power of Congress beyond anything yet approved or permitted by this court. The reasoning which is advanced to uphold this extension of power under the National Prohibition Act of October 28, 1919, would practically overthrow the doctrine of *Hammer* v. *Dagenhart,* 247 U. S. 251, 273, 276, and analogous cases, denying to Congress any such general police power in aid of its express powers.

The case of *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, presented for consideration solely the police powers of the States in so far as they were limited by the Fourteenth Amendment. The national government has no police power and may not, therefore, enact laws prohibiting the manufacture and sale of intoxicants simply because Congress deems that course advisable for the public welfare. The *Purity Extract Co. Case,* moreover, prohibited all malt liquors, whether intoxicating or not, because malt beverages might be used to conceal intoxicating malt liquors. No such object can be attributed to the Act of Congress of October 28, 1919, because it does not prohibit all malt liquors, but divides them by an arbitrary standard of percentage of alcohol.

It does not follow that because Congress may exercise the power of prohibiting intoxicants in war time, it can go further and ban non-intoxicants as an incident to this implied incidental power. The Constitution merely confers upon Congress the right to exercise powers incidental

to enumerated powers if necessary and proper, not the right to exercise powers incidental to implied incidental powers.  Any other theory would strip the States of all their powers for, if each implied-incidental power breeds new powers by added implication, there is no point at which the process can be halted, but the result must in time be one consolidated government in place of our present federal system.  The fallacy of such a doctrine was early exposed by Jefferson in a letter to Livingston (Ford's Jefferson, vol. VII, p. 44).  See, also, *McCulloch v. Maryland*, 4 Wheat. 316, 411; 3 Hamilton's Works (Lodge's ed.), p. 192; 1 Congressional Debates, p. 1899 (Madison, Feb., 1791); 22 Annals of Congress, p. 212 (Clay, Feb., 1811); Rept. No. 1143, House of Rep., Feb. 26, 1919, pp. 7, 9.

The Act of Congress of October 28, 1919, is particularly unjust and oppressive in respect of the brewers of the United States.  These brewers were engaged in manufacturing and selling a beverage which is non-intoxicating, which was expressly authorized by the President in his proclamation of December 8, 1917, in force during a large part of the war period, and which was prohibited by him only in his proclamation of September 16, 1918, when the conservation of all the food products of the country became necessary.  Millions of dollars worth of non-intoxicating beer have been manufactured in good faith in reliance upon the proclamations of the President of January 30 and March 4, 1919, and the value of all this product will in large measure be destroyed by the operation of the Act of October 28, 1919, if it be constitutional, without any compensation whatever, on the theory that this sacrifice of the property of a particular class at this time is necessary and proper for carrying into execution the war powers of the Nation!

As to the non-intoxicating beer on hand on October 28, 1919, which was manufactured under authority of the

President's proclamations of December 8, 1917, and January 30 and March 4, 1919, it is submitted that its sale could not be prohibited and its commercial value destroyed without the just compensation guaranteed to all by the Fifth Amendment. *Wynehamer* v. *People*, 13 N. Y. 378; *Bartemeyer* v. *Iowa*, 18 Wall. 129, 133; *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32; *Eberle* v. *Michigan*, 232 U. S. 700, 706; *Barbour* v. *Georgia*, 249 U. S. 454, 460; *Mugler* v. *Kansas*, 123 U. S. 623.

[A supplemental brief was submitted on the proposition that the Act of November 21, 1918, was not intended to include non-intoxicating beer or wine—as to which, see *United States* v. *Standard Brewery, ante,* 210.]

*The Solicitor General* and *Mr. Assistant Attorney General Frierson* for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

By the Act of August 10, 1917, c. 53, § 15, 40 Stat. 276, 282, a war measure known as the Lever Act, Congress prohibited the use after September 9, 1917, of food materials or feeds in the production of distilled spirits for beverage purposes and authorized the President to limit or prohibit their use in the production of malt or vinous liquors for beverage purposes, so far as he might, from time to time, deem it essential to assure an adequate supply of food, or deem it helpful in promoting the national security or defense. Under the power so conferred the President, by proclamation of December 8, 1917, 40 Stat. 1728, prohibited the production after January 1, 1918, of any "malt liquor except ale and porter" containing more than 2.75 per centum of alcohol by weight. By proclamation of September 16, 1918, 40 Stat. 1848, the prohibition was extended to "malt liquors, including near beer, for

beverage purposes, whether or not such malt liquors contain alcohol"; and by proclamation of March 4, 1919, 40 Stat. 1937, the prohibition was limited "to intoxicating malt liquors." Under § 2 of the act the duty of enforcing the above provisions was assigned to the Commissioner of Internal Revenue. This act contained no provision prohibiting the sale of intoxicating or other liquors.

On November 21, 1918, the so-called War-Time Prohibition Act (c. 212, 40 Stat. 1045) was approved. It provided that:

"After May first, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, no grains, cereals, fruit or other food product shall be used in the manufacture or production of beer, wine, or other intoxicating malt or vinous liquor for beverage purposes. After June thirtieth, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, no beer, wine, or other intoxicating malt or vinous liquor shall be sold for beverage purposes except for export. . . . ."

On February 6, 1919, the Commissioner of Internal Revenue ruled (Treasury Decision 2788) that a beverage containing as much as one-half of one per centum of alcohol by volume would be regarded as intoxicating within the intent of the Act of November 21, 1918; and that after May 1, 1919, persons would not be permitted to qualify as brewers, if the alcoholic content of their product equalled or exceeded that percentage. In so ruling the Commissioner adopted and applied to this prohibitory act the same classification of malt liquors which had been applied in administering the laws concerning the taxation of beer and other similar fermented liquors.

For since 1902 (Treasury Decision 514) fermented liquor containing as much as one-half of one per centum of alcohol had been treated as taxable under Rev. Stats. §§ 3339 and 3242; and this classification was expressly adopted in the War Revenue Act of October 3, 1917, c. 63, § 307; 40 Stat. 311. The correctness of this construction of the act was promptly and earnestly controverted by the brewers, who insisted that Congress had intended to prohibit the production only of such beer or other malt liquors as were in fact intoxicating. The attempt was then made to remove the doubt by new legislation before May 1, 1919, when the act would by its terms become operative. On February 26 the House Committee on the Judiciary reported favorably an amendment to H.R. 13581 providing: "The words 'beer, wine or other intoxicating malt or vinous liquors' in the war prohibition act shall be construed to mean any liquors which contain in excess of one-half of one per centum of alcohol." The Sixty-fifth Congress ended on March 4 without acting on this bill; and the Sixty-sixth Congress did not convene in Extra Session until May 19. On June 30, the House Committee on the Judiciary reported substantially the same provision as § 1 of Title I of H. R. 6810; but it was not enacted until October 28, 1919, when as the Volstead Act it was passed over the President's veto.[a]

Note (a):—

"The term 'War Prohibition Act' used in this Act shall mean the provisions of any Act or Acts prohibiting the sale and manufacture of intoxicating liquors until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States. The words 'beer, wine, or other intoxicating malt or vinous liquors' in the War Prohibition Act shall be hereafter construed to mean any such beverages which contain one-half of 1 per centum or more of alcohol by volume: Provided, That the foregoing definition shall not extend to dealcoholized wine nor to any beverage or liquid produced by the process by which beer, ale, porter or wine is produced, if it con-

Immediately after the passage of the Volstead Act, this suit was brought in the District Court of the United States for the Southern District of New York by Jacob Ruppert against Caffey, United States Attorney, and McElligott, Acting Collector of Internal Revenue, to enjoin the enforcement as against the plaintiff of the penalties provided in the War-Time Prohibition Act as amended by the Volstead Act. It was heard below on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss; and having been dismissed, was brought here by direct appeal under § 238 of the Judicial Code. The bill alleged that plaintiff, the owner of a brewery and appurtenances, was on October 28, 1919, engaged in the manufacture of a beer containing more than one-half of one per centum of alcohol by volume and less than 2.75 per centum by weight or 3.4 per centum by volume, and had then on hand a large quantity of such beer; and that this beer was not in fact intoxicating. Plaintiff contended (1) that the Act of November 21, 1918, had become void or had expired by its own terms before the bill was filed; (2) that its prohibition by its terms was limited to beer which was in fact intoxicating; (3) that the Act of October 28, 1919, Title I, § 1, which purported to extend the prohibition to the manufacture and sale of beer not in fact intoxicating, exceeded the war power of Congress; and that thereby violation of rights guaranteed to plaintiff by the Fifth Amendment was threatened.

This case was heard and decided below with *Dryfoos v. Edwards, ante,* 146; and it was argued here on the same day with that case and *Hamilton* v. *Kentucky Distilleries & Warehouse Co., ante,* 146. For the reasons set forth in

tains less than one-half of 1 per centum of alcohol by volume, and is made as prescribed in section 37 of Title II of this Act, and is otherwise denominated than as beer, ale, or porter, and is contained and sold in, or from, such sealed and labeled bottles, casks, or containers as the commissioner may by regulation prescribe."

the opinion in those cases, the Act of November 21, 1918, was and remained valid as against the plaintiff and had not expired. For the same reasons § 1 of Title I of the Act of October 28, 1919, was not invalid, merely because it was new legislation. But it is insisted that this legislation is nevertheless void as against the plaintiff, because Congress could not, even under its full war powers, prohibit the manufacture and sale of non-intoxicants, and, at all events, could not without making compensation, extend the prohibition to non-intoxicating liquor acquired before the passage of the act. These objections require consideration.

*First:* May the plaintiff show as a basis for relief that the beer manufactured by it with alcoholic content not greater than 2.75 per centum in weight and 3.4 per centum in volume is not in fact intoxicating? The Government insists that the fact alleged is immaterial since the passage of the Volstead Act by which the prohibition of the manufacture and sale is extended to all beer and other malt liquor containing as much as one-half of one per centum of alcohol by volume.

If the war power of Congress to effectively prohibit the manufacture and sale of intoxicating liquors in order to promote the Nation's efficiency in men, munitions and supplies is as full and complete as the police power of the States to effectively enforce such prohibition in order to promote the health, safety and morals of the community, it is clear that this provision of the Volstead Act is valid, and has rendered immaterial the question whether plaintiff's beer is intoxicating. For the legislation and decisions of the highest courts of nearly all the States establish that it is deemed impossible to effectively enforce either prohibitory laws or other laws merely regulating the manufacture and sale of intoxicating liquors, if liability or inclusion within the law is made to depend upon the issuable fact whether or not a particular liquor made or sold as a beverage is intoxicating. In other words, it clearly appears

that a liquor law, to be capable of effective enforcement must, in the opinion of the legislatures and courts of the several States, be made to apply either to all liquors of the species enumerated, like beer, ale or wine, regardless of the presence or degree of alcoholic content; or if a more general description is used, such as distilled, rectified, spirituous, fermented, malt or brewed liquors, to all liquors within that general description regardless of alcoholic content;[b] or to such of these liquors as contain

Note (b):—

Cases to this effect are *Marks* v. *State*, 159 Alabama, 71; *Brown* v. *State*, 17 Arizona, 314; *Bradshaw* v. *State*, 76 Arkansas, 562; *Seibert* v. *State*, 121 Arkansas, 258; *In re Lockman*, 18 Idaho, 465; *Hansberg* v. *People*, 120 Illinois, 21, 23 (dictum); *Kurz* v. *State*, 79 Indiana, 488; *Sawyer* v. *Botti*, 147 Iowa, 453; *State* v. *Colvin*, 127 Iowa, 632; *State* v. *Miller*, 92 Kansas, 994; *State* v. *Trione*, 97 Kansas, 365; *Commonwealth* v. *McGrath*, 185 Massachusetts, 1; *Extract & Tonic Co.* v. *Lynch*, 100 Mississippi, 650; *State* v. *Centennial Brewing Co.*, 55 Montana, 500; *Luther* v. *State*, 83 Nebraska, 455; *State* v. *Thornton*, 63 N. H. 114; *People* v. *Cox*, 106 App. Div. (N. Y.) 299; *People* v. *O'Reilly*, 129 App. Div. (N. Y.) 522; *LaFollette* v. *Murray*, 81 Oh. St. 474; *State* v. *Walder*, 83 Oh. St. 68; *State* v. *Bottling Works*, 19 N. Dak. 397; *State* v. *Ely*, 22 S. Dak. 487; *State* v. *Oliver*, 26 W. Va. 422, 427 (dictum); *Pennell* v. *State*, 141 Wisconsin, 35; *United States* v. *Cohn*, 2 Ind. Ter. 474; *Purity Extract Co.* v. *Lynch*, 226 U. S. 192.

*Contra:*—*City of Bowling Green* v. *McMullen*, 134 Kentucky, 742; *Reisenberg* v. *State*, 84 S. W. Rep. (Tex.) 585; *State* v. *Olsen*, 95 Minnesota, 104; *Intoxicating Liquor Cases*, 25 Kansas, 751; *State* v. *Virgo*, 14 N. Dak. 293; *State* v. *Maroun*, 128 Louisiana, 829; *Howard* v. *Acme Brewing Co.*, 143 Georgia, 1.

In Kansas, the legislature overruled this decision by Laws of 1909, c. 164, § 4, see *State* v. *Trione, supra;* in Minnesota, made the prohibition apply to all malt liquors containing as much as ½ of 1% of alcohol by volume, Laws of 1919, c. 455, p. 537; in North Dakota by Laws of 1909, c. 187, p. 277, see *State* v. *Bottling Works*, 19 N. Dak. 397, the prohibition applied to all liquors which retained "the alcoholic principle;" in Louisiana Acts of 1914, Nos. 146, 211, operated to cut down the per cent. of alcohol to 1.59, see *State* v. *George,* 136 Louisiana, 906. In Georgia Acts of 1919, p. 931, changed the rule of *Howard* v. *Acme Brewing Co., supra*, see Note (d) 4, *infra*, 289.

a named percentage of alcohol; and often several such
standards are combined so that certain specific and generic
liquors are altogether forbidden and such other liquors as
contain a given percentage of alcohol.

A test often used to determine whether a beverage is to
be deemed' intoxicating within the meaning of the liquor
law is whether it contains one-half of one per cent. of
alcohol by volume. A survey of the liquor laws of the
States reveals that in seventeen States the test is either a
list of enumerated beverages without regard to whether
they contain any alcohol or the presence of any alcohol in
a beverage, regardless of quantity; [c] in eighteen States it

---

Note (c):—

1. Alabama:—Gen. Laws Sp. Sess. 1907, No. 53, § 1, p. 71, made it
unlawful to sell "any alcoholic, spirituous, vinous or malt liquors,
intoxicating bitters or beverages, or other liquors or beverages . .
which if drunk to excess will produce intoxication."

Marks v. State, 159 Alabama, 71, 78, stated that "or other liquors
or beverages . . . which if drunk to excess will produce intoxi-
cation" did not modify or limit the prohibition of the liquors enu-
merated. Any unenumerated liquor, however, must be proved to be
intoxicating if drunk to excess.

Gen. Laws, 1919, Act No. 7, p. 6, in terms prohibits all liquors con-
taining any alcohol.

2. Arizona:—Constitution, Art. 23, § 1, prohibits "ardent spirits,
ale, beer, wine, or intoxicating liquor or liquors of whatever kind."

Brown v. State, 17 Arizona, 314, held that "beer" was prohibited
whether or not it was intoxicating.

3. Arkansas:—Acts of 1917, Act 13, p. 41, as amended by Acts of
1919, Act 87, p. 75, prohibits "any alcoholic, vinous, malt, spirituous
or fermented liquors."

Seibert v. State, 121 Arkansas, 258, held that the enumerated liquors
are prohibited whether they are intoxicating or not if they contained
any alcohol.

An earlier act contained the words "or other intoxicating liquors"
following "or fermented liquors." It was held in Bradshaw v. State, 76
Arkansas, 562, that this clause did not modify the enumerated liquors
and that they were prohibited whether intoxicating or not.

4. Colorado:—Sess. Laws, 1915, c. 98, § 30—(Prohibition)—as

is the presence of as much as or more than one-half of one per cent. of alcohol; [d] in six States, one per cent. of alcohol; [e] in one State, the presence of the "alcoholic principle;" and in one State, two per cent. of alcohol. [g]    Thus in

amended by Sess. Laws, 1919, c. 141, prohibits "intoxicating liquors . . . no matter how small the percentage of alcohol they may contain."

4½. Hawaii:—Rev. Laws, 1915, § 2101. (License Law) "'Intoxicating liquors' . . . shall be held to include spirituous liquors, and any beverage in which may be found any percentage of distilled spirits, spirits, alcohol and alcoholic spirit as defined by the laws of the United States, and any sake, beer, lager beer, ale, porter and malt or fermented or distilled liquors."

5. Idaho:—Sess. Laws, 1909, p. 18. (Local Option)—"spirituous, vinous, malt, and fermented liquors . . . and other drinks that may be used as a beverage and produce intoxication."

*In re Lockman,* 18 Idaho, 465, held that the enumerated liquors are within the act whether or not they are intoxicating.

Constitutional Amendment of Nov. 7, 1916 (Prohibition). (Sess. Laws, 1917, p. 528.) The Enforcement Laws are cumulative, including Sess. Laws, 1915, c. 28; Sess. Laws, 1915, c. 11 (see § 23); Sess. Laws, 1911, c. 15; and Sess. Laws, 1909, p. 18. Thus the definition and interpretation above are retained.

6. Iowa:—Rev. Code (1897–1915), § 2382. Prohibits "any intoxicating liquor, which term shall be construed to mean alcohol, ale, wine, beer, spirituous, vinous and malt liquor, and all intoxicating liquor whatever."

*State* v. *Intoxicating Liquors,* 76 Iowa, 243 (1888); and *State* v. *Colvin,* 127 Iowa, 632 (1905); *Sawyer* v. *Botti,* 147 Iowa, 453 (1910), held that liquor containing any alcohol whatever is prohibited.

7. Kansas:—Laws of 1881, c. 128, § 1 (Gen. Stats. 1915, § 5498). Prohibits "any spirituous, malt, vinous, fermented or other intoxicating liquors."

*Intoxicating Liquor Cases,* 25 Kansas, 751, held that in every case the question of the intoxicating quality of the beverage must go to the jury.

Laws of 1909, c. 164, § 4 (Gen. Stats. 1915, § 5501), amended the Act of 1881 as follows: "All liquors mentioned in section 1 of this act shall be construed and held to be intoxicating liquors within the meaning of this act."

*State* v. *Miller,* 92 Kansas, 994; *State* v. *Trione,* 97 Kansas, 365, de-

forty-two of the forty-eight States—Maryland appears in
two classes above—a malt liquor containing over two per
cent. of alcohol by weight or volume is deemed, for the
purpose of regulation or prohibition, intoxicating as a

---

clared that the former case is no longer the law and that the mere
presence of the liquors mentioned makes the substance intoxicating
for purposes of the prohibition statutes.

See also Laws of 1917, cc. 215, 216, "Bone Dry Prohibition Law."

8. Louisiana:—*Shreveport Ice Co.* v. *Brown,* 128 Louisiana, 408, held
that a statute regulating the sale of "spirituous and intoxicating
liquors" includes only intoxicating liquors.

Acts of Extra Session, 1910, No. 171, defines "Grog-Shop" as a
place where "intoxicating, spirituous, vinous, or malt liquors are
sold" (and forbids them in prohibition territory).

*State* v. *Maroun,* 128 Louisiana, 829, held that the malt liquors must
be intoxicating to be within the meaning of the statute.

Acts of 1914, No. 146, repeats a similar definition of grog-shop or
blind tiger. Acts of 1914, No. 211, forbids the manufacture of near-
beer with more than 1.59% of alcohol by weight or 2% by volume; and
prohibits the sale of the near-beer thus made under the same roof
where any other beverage is sold.

*State* v. *George,* 136 Louisiana, 906, seems to hold that this near-beer
may be sold in prohibition territory where the "grog-shops" are not
allowed.

Acts of 1916, No. 14, prohibits the sale or keeping for sale of any
"malt liquors, whether intoxicating or not, and whether containing
alcohol or not, in any parish, ward, city, town or village of this State
where the sale of intoxicating liquors is prohibited by law or ordi-
nance. . . ."

9. Maryland:—Laws of 1914, c. 831, § 1, p. 1569 (Prohibition in Cer-
tain Counties), forbids "any spirituous, vinous, fermented, malt or
intoxicating liquors, or any mixture thereof containing alcohol for
beverage purposes. . . ."

Laws of 1916, c. 389, § 1, p. 786. Prohibits in a certain county "any
kindred preparation or beverage, having the appearance and taste of
Lager Beer . . . except those beverages that are labeled . . .
stating that the beverage is free of alcohol."

See also Note *d* (8), *infra,* 290; and Note *h, infra,* 296. These cita-
tions are not exhaustive of the Maryland county prohibition statutes.

10. Michigan:—Public Acts, 1919, No. 53, § 3, p. 81. " 'Intoxicating
liquors' . . . include any vinous, malt, brewed, fermented or

matter of law. Only one State has adopted a test as high as 2.75 per cent. by weight or 3.4 per cent. by volume.[h] Only two States permit the question of the intoxicating character of an enumerated liquor to be put in issue.[i] In

spirituous liquors . . . and all liquids . . . which contain any alcohol and are capable of being used as a beverage."

11. Mississippi:—Code of 1906, § 1746, as amended by Laws of 1908, c. 115, p. 116 (Code, 1917, § 2086). Prohibits the sale of "any vinous, alcoholic, malt, intoxicating or spirituous liquors, or intoxicating bitters, or other drinks which if drank to excess will produce intoxication."

*Fuller* v. *City of Jackson*, 97 Mississippi, 237; *Extract & Tonic Co.* v. *Lynch*, 100 Mississippi, 650. All the enumerated drinks are prohibited whether they contain alcohol or are intoxicating or both or neither.

Laws of 1918, c. 189, § 1, p. 210. Prohibits "spirituous, vinous, malted, fermented, or other intoxicating liquors of any kind."

12. New Mexico:—Stats. 1915, § 2874. "All persons who make for sale fermented liquors of any name or description, from malt, wholly or in part, or from any substitute therefor, shall be considered brewers." Section 2937. "The words 'intoxicating liquors' . . . include all malt, vinous, and spirituous liquors."

Constitutional Amendment, proposed by Legislature of 1917, Laws of 1917, p. 352, prohibits "ardent spirits, ale, beer, alcohol, wine or liquor of any kind whatsoever containing alcohol."

13. New York:—Laws of 1897, c. 312, § 2; and Laws of 1903, c. 486, § 2, as amended by Laws of 1905, c. 679, § 2, defining intoxicating liquors as "all distilled or rectified spirits, wine, fermented and malt liquors."

*People* v. *Cox*, 106 App. Div. 299, held that "Malt Rose containing .74% of alcohol and made from malt was within the meaning of the act.

*People* v. *O'Reilly*, 129 App. Div. 522 (affd. 194 N. Y. 592), holds that beer comes within the act whether intoxicating or not, and declares that an earlier line of cases holding that the intoxicating quality is always for the jury to decide are no longer applicable where liquors are named in the act.

Laws of 1917, c. 624, § 2, p. 1835. City Local Option Law. Continues the definition.

14. Ohio:—Rev. Stats. 1906, §§ 4364–9, laid a tax on the business of "trafficking in spirituous, vinous, malt, or any intoxicating liquors."

*LaFollette* v. *Murray*, 81 Ohio St. 474, held that "Friedon Beer" a

three other States the matter has not been made clear either by decision or legislation.[j] The decisions of the courts as well as the action of the legislatures make it clear—or, at least, furnish ground upon which Congress

malt liquor containing .47% of alcohol and not intoxicating was within the statute.

*State* v. *Walder*, 83 Ohio St. 68.

Laws of 1919, §§ 6212–15, p. 388. (Prohibition.) ". . . 'liquor' or . . . 'intoxicating liquors' . . . include any distilled, malt, spirituous, vinous, fermented or alcoholic liquor, and also any alcoholic liquid . . . which . . . is . . . capable of being used as a beverage."

15. South Dakota:—Sess. Laws of 1890, c. 101, § 6, p. 229 (Prohibition). Intoxicating liquors include "all spirituous, malt, vinous, fermented or other intoxicating liquors or mixtures . . . that will produce intoxication."

Rev. Pol. Code, 1903, § 2834, requires a license to sell "any spirituous, vinous, malt, brewed, fermented or other intoxicating liquors."

*State* v. *Ely*, 22 S. Dak. 487, held that the liquors named come within the act whether or not they are intoxicating.

Rev. Code, 1919, § 10237. " 'Intoxicating Liquors' . . . include whiskey, alcohol, brandy, gin, rum, wine, ale, beer, absinthe, cordials, hard or fermented cider, . . . and all distilled, spirituous, vinous, malt, brewed and fermented liquors, and every other liquid . . . containing alcohol, which . . . is capable of being used as a beverage."

15½. United States:—28 Stat. 697, § 8 (Indian Territory Prohibition), prohibits "any vinous, malt, or fermented liquors, or any other intoxicating drinks."

*United States* v. *Cohn*, 2 Ind. Ter. 474, held that the act prohibits all malt liquors whether or not they are intoxicating.

See also 39 Stat. 903 (Alaska Prohibition); and 39 Stat. 1123 (D. of C. Prohibition), both of which prohibit "all malt liquors."

16. Washington:—Code, 1912, Title 267, § 45 (Local Option). "'Intoxicating liquor' . . . shall . . . include whiskey, brandy, rum, wine, ale, beer, or any spirituous, vinous, fermented, malt or any other liquor containing intoxicating properties . . . except preparations compounded by a registered pharmacist, the sale of which would not subject him to the payment of the special liquor tax required by the laws of the United States."

Sess. Laws of 1915, c. 2, § 2 (Prohibition). " 'Intoxicating liq-

reasonably might conclude—that a rigid classification of beverages is an essential of either effective regulation or effective prohibition of intoxicating liquors.[k]

*Purity Extract Co.* v. *Lynch*, 226 U. S. 192, determined that state legislation of this character is valid and set forth

---

uor' . . . shall . . . include whiskey, etc., [as above] and all liquids . . . which contain any alcohol, which are capable of being used as a beverage."

*State* v. *Hemrich*, 93 Washington, 439.

17. Wisconsin:—Gen. Stats., 1911, § 1565c (Local Option), "any spirituous, malt, ardent or intoxicating liquors or drinks."

*Pennell* v. *State*, 141 Wisconsin, 35, holds that the statute forbids fermented malt liquors containing alcohol whether intoxicating or not.

See also Montana, Note *(g)*, *infra*, 295.

NOTE *(d)*:—

1. Connecticut:—Public Acts, 1919, c. 241, p. 2917, defines intoxicating liquors, "all beer manufactured from hops and malt or from hops and barley, and all beer on the receptacle containing which the laws of the United States require a revenue stamp to be affixed [but it] shall not include beverages which contain no alcohol. . . ."

2. Delaware:—Laws of 1917, c. 10, p. 19 (Local Option Enforcement), defines as follows: "all liquid mixtures . . . containing so much as $\frac{1}{2}$ of 1% of alcohol by volume shall be deemed liquors and shall be embraced in the word 'liquors' as hereinafter used in this Act."

3. Florida:—Acts of Sp. Sess. 1918, c. 7736, § 7, as amended by Acts of 1919, c. 7890, defines intoxicating liquor, which it prohibits, as all beverages containing "$\frac{1}{2}$ of 1% of alcohol, or more, by volume."

4. Georgia:—Acts of 1915, Sp. Sess., pp. 77, 79 [Park's Annotated Code, Supplement, 1917, Penal Code, § 448 (b) ], defines "prohibited liquors" as ". . . beer, . . . near-beer, . . . and . . . beverages containing $\frac{1}{2}$ of 1% of alcohol or more by volume."

5. Illinois:—Rev. Stats. 1874, c. 43, § 1 ("Dram Shop Act"), defines a dram shop as a place "where spirituous or vinous or malt liquors are retailed . . . and intoxicating liquors shall be deemed to include all such liquors."

*Hansberg* v. *People*, 120 Illinois, 21, 23. Indictment for selling "intoxicating liquors." Proof of selling "beer." The court said: "No evidence whatever was offered or admitted for the purpose of explaining or showing what beer was made of, or what its characteristics were, or whether it was malt, vinous, spirituous or intoxicating."

with clearness the constitutional ground upon which it rests: "When a State exerting its recognized authority undertakes to express what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make

Laws of 1919, p. 931 (Search and Seizure Law). " 'Intoxicating liquor or liquors' shall include all distilled, spirituous, vinous, fermented or malt liquors which contain more than $\frac{1}{2}$ of 1% by volume of alcohol."

6. Indiana:—Rev. Stats. 1881, § 2094, "whoever . . . sells . ,. any spirituous, vinous, malt, or other intoxicating liquors."

*Kurz* v. *State*, 79 Indiana, 488, 490: "It devolves on the State, therefore, to prove that the beer sold was either a malt liquor or that it was, in fact, intoxicating liquor."

Laws of 1911, c. 119, § 29 (Saloon Regulation Act). "The words 'intoxicating liquors,' shall apply to any spirituous, vinous or malt liquor, or to any intoxicating liquor whatever, which is used . . . as a beverage and which contains more than $\frac{1}{2}$ of 1% of alcohol by volume."

Laws of 1917, c. 4, § 2 (Prohibition Act). "The words 'intoxicating liquor,' as used in this act shall be construed to mean all malt, vinous, or spirituous liquor, containing so much as $\frac{1}{2}$ of 1% of alcohol by volume."

7. Maine:—Rev. Stats. 1916, c. 127, § 21 (Prohibition Act), declares "wine, ale, porter, strong beer, lager beer and all other malt liquors, and cider when kept or deposited with intent to sell the same for tippling purposes, . . . are declared intoxicating within the meaning of this chapter."

*State* v. *Frederickson*, 101 Maine, 37, holds that cider comes within the act whether or not it is in fact intoxicating.

*State* v. *Piche*, 98 Maine, 348, holds that in case of a liquor not enumerated the jury must find the question of intoxicating quality.

Laws of 1919, c. 235, § 21, prohibits "as well as any beverage containing a percentage of alcohol which by federal enactment or by decision of the Supreme Court of the United States, now or hereafter declared, renders a beverage intoxicating."

8. Maryland:—Laws of 1917, Extra Session, c. 13, § 1 (Prohibition in Prince George's County). "Malt liquors shall be construed to embrace porter, ale, beer and all malt or brewed drinks whether intoxicating or not containing as much as $\frac{1}{2}$ of 1% of alcohol by volume; and that the words 'intoxicating liquors' . . . shall . . . embrace

its action effective. It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a

both spirituous liquors and malt liquors and . . . all liquid mixtures, . . . containing so much as ½ of 1% of alcohol by volume." See also Note *c* (9), *supra*, 286, and Note *h, infra,* 296.

9. Minnesota:—Gen. Stats. 1913, § 3188, and Gen. Stats., Suppl. 1917, § 3161, provide that "the terms 'intoxicating liquor' and 'liquor' . . . shall include distilled, fermented, spirituous, vinous, and malt liquor."

*State* v. *Gill,* 89 Minnesota, 502, held that only those malt liquors which were intoxicating were within the meaning of the act.

Laws of 1919, c. 455, p. 537 (Prohibition). " 'Intoxicating liquor' and 'liquor' shall include and mean ethyl alcohol and any kind of distilled, fermented, spirituous, vinous, or malt liquor or liquid of any kind potable as a beverage, whenever any of said liquors or liquids contain ½ of 1% or more of alcohol by volume."

10. Missouri:—Rev. Stats., 1909, § 7243. "If a majority of the votes . . . shall be 'against the sale of intoxicating liquors,' it shall be unlawful for any person . . . [to sell] . . . any kind of intoxicating liquors or beverage containing alcohol in any quantity whatever."

*State* v. *Gamma,* 149 Mo. App. 694; *State* v. *Burk,* 151 Mo. App. 188; *State* v. *Wills,* 154 Mo. App. 605.

Laws of 1919, c. ——, § 15. "The phrase 'intoxicating liquor' or 'intoxicating liquors' whenever used in this act shall be construed to mean and include any distilled, malt, spirituous, vinous, fermented, or alcoholic liquors, all alcoholic liquids . . . which contain ½ of 1% of alcohol by volume . . . ; *Provided, however,* that when the above mentioned phrases . . . are defined in the laws of the United States, then such definition of Congress shall supersede and take the place of the definition . . . in this section."

11. Nebraska:—Cobbey's Compiled Stats. 1907, § 7161, forbids the sale of "malt, spirituous, or vinous liquors or any intoxicating drinks" without a license.

*Luther* v. *State,* 83 Nebraska, 455, holds that all malt liquors fall within the meaning of the statute whether or not they are intoxicating.

Laws of 1917, c. 187, § 1 (Prohibition). "'Intoxicating liquors' . . . embrace all malt, fermented, vinous, or spirituous liquors, wine, ale, porter, beer, or any intoxicating drink , . . , and all

purpose within the admitted power of the Government."
(P. 201.) "It was competent for the legislature of Mississippi to recognize the difficulties besetting the administration of laws aimed at the prevention of traffic in intox-

---

malt or brewed drinks and all mixtures . . . which will produce
intoxication, and in addition thereto such liquors of a different character and not hereinbefore enumerated capable of use as a beverage
containing over ½ of 1% of alcohol by volume."

12. Nevada:—Laws of 1919, c. 1, § 1 (Prohibition). "The words
'liquors' . . . shall embrace all malt, vinous, or spirituous liquors, wine, porter, ale, beer, or any other intoxicating drink . . . ,
and all malt or brewed drinks, whether intoxicating or not, shall be
deemed malt liquors within the meaning of this act . . . and all
beverages containing so much as ½ of 1% of alcohol by volume, shall
be deemed spirituous liquors."

*State* v. *Reno Brewing Co.*, 42 Nevada, 397.

13. Oklahoma:—Sess. Laws of 1913, c. 26, § 6, and Sess. Laws of
1917, c. 186 (Prohibition), both define intoxicating liquors as "spirituous, vinous, fermented or malt liquors . . . or any liquors which
contain as much as ½ of 1% of alcohol by volume."

*Estes* v. *State*, 13 Okla. Crim. Rep. 604, held that the State to
secure conviction for violation of the act must prove either that the
liquor contained more than ½ of 1% of alcohol or that it was in fact
intoxicating.

14. Oregon:—Laws of 1905, c. 2 (Local Option), used only the term
"intoxicating liquors."

*State* v. *Carmody*, 50 Oregon, 1, held that the court will judicially
recognize that "beer" is intoxicating in an indictment for selling "intoxicating liquors."

Laws of 1915, c. 141, § 2, p. 151. " 'Intoxicating liquors' . . .
embrace all spirituous, malt, vinous, fermented, or other intoxicating
liquors, and all mixtures . . . which contain in excess of ½ of
1% of alcohol by volume shall be deemed to be embraced within the
term independently of any other test of their intoxicating character."

15. Tennessee:—Acts of 1917, c. 4, p. 6 (Ann. Code, 1918, § 6798a34).
Clubs, etc., may not have on their premises any liquor "containing
more than ½ of 1% of alcohol."

16. Utah:—Laws of 1911, c. 106, § 2; Laws of 1913, c. 81, § 2 (License
Laws), "any spirituous, vinous, fermented or malt liquor that may
be used as a beverage and produce intoxication."

Laws of 1917, c. 2, § 2 (Prohibition). " 'Liquors' . . . em-

icants. It prohibited, among other things, the sale of
'malt liquors.' In thus dealing with a class of beverages
which in general are regarded as intoxicating, it was not
bound to resort to a discrimination with respect to ingre-
dients and processes of manufacture which, in the en-

brace all fermented, malt, vinous, or spirituous liquors, alcohol, wine,
porter, ale, beer, absinthe or any other intoxicating drink . . .
and all malt or brewed drinks; and all liquids . `.` . which will
produce intoxication; . . . and all beverages containing in excess
of ½ of 1% of alcohol by volume."

17. Virginia:—Code of 1887, § 587 (Local Option), "any. wine,
spirituous or malt liquors, or any mixture thereof."

*Savage* v. *Commonwealth,* 84 Virginia, 582, and 619, held that a sale
of "ginger extract" in order to be illegal requires the proof that the
extract is intoxicating.

Acts of 1916, c. 146, § 1, p. 216, "ardent spirits . . . embrace
alcohol, brandy, whisky, rum, gin, wine, porter, ale, beer, all malt
liquors, absinthe, and all compounds . . . ; and all beverages
containing more than ½ of 1% of alcohol by volume."

18. West Virginia:—Code, c. 32, § 1, as amended by Acts of 1877, c.
107, prohibits the sale of "spirituous liquors, wine, porter, ale, beer, or
any drink of a like nature . . . and all mixtures . . . known
as 'bitters' . . . which will produce intoxication . . . shall
be deemed intoxicating liquors." See *State* v. *Oliver,* 26 W. Va. 422, 427.

Code of 1906, c. 32, § 1, is substantially the same.

*State* v. *Henry,* 74 W. Va. 72, on indictment for selling "intoxicating
liquors" held that evidence of sale of "bevo" containing 1.31% of
alcohol sufficient to sustain a conviction.

Acts of 1913, c. 13, § 1. " 'Liquors' . . . embrace all malt,
vinous, or spirituous liquors, wine, porter, ale, beer, or any other in-
toxicating drink . . . ; and all malt or brewed drinks whether
intoxicating or not shall be deemed malt liquors . . . and all
beverages containing so much as ½ of 1% of alcohol by volume."

NOTE (*e*):—

1. California:—Stats. 1911, c. 351, § 21 (Local Option and License).
" 'Alcoholic liquors' . . . include spirituous, vinous and malt
liquors, and any other liquor . . . which contains 1%" of alcohol
or more.

*People* v. *Strickler,* 25 Cal. App. 60, held that the clause "and any
other liquor which shall contain 1% of alcohol or more" modified the

deavor to eliminate innocuous beverages from the con-
demnation, would facilitate subterfuges and frauds and
fetter the enforcement of the law. A contrary conclusion
logically pressed would save the nominal power while pre-
venting its effective exercise." (P. 204.) "The State,

enumerated liquors, so that a malt liquor containing less than 1% of
alcohol and not intoxicating did not fall within the act.

2. Massachusetts:—Rev. Laws, 1902, c. 100, § 2 (Local Option and
License). "Ale, porter, strong beer, lager beer, cider, all wines, any
beverage which contains more than 1% of alcohol by volume . . .
shall be deemed to be intoxicating."

*Commonwealth* v. *McGrath*, 185 Massachusetts, 1, held that cider
fell within the act whether it contained 1% of alcohol or was intoxicat-
ing or neither.

*Commonwealth* v. *Blos*, 116 Massachusetts, 56, held that a liquor not
enumerated in the statute is not prohibited unless it falls within the
general definition which is a question for the jury.

Suppl. to Rev. Laws, 1908, c. 100, § 1, retains the same definition.

3. New Hampshire:—Gen. Laws, 1878, c. 109, § 15, restricted the
sale of "lager beer or other malt liquors."

*State* v. *Thornton*, 63 N. H. 114; act includes all malt liquors.

Suppl. to Pub. Stat. and Sess. Laws, 1901–1913, p. 7, defines in-
toxicating liquors as "all distilled liquors or rectified spirits; vinous,
fermented, brewed and malt liquors; and any beverage . . . con-
taining more than 1% of alcohol by volume."

Laws of 1917, c. 147, § 60 (Prohibition). "By the words spirit, liq-
uor, spirituous liquor, intoxicating liquor [is meant] all distilled liquors,
or rectified spirits; vinous, fermented, brewed and malt liquors; and
any beverage . . . containing more than 1% of alcohol, by
volume."

4. South Carolina:—Rev. Stats. 1893, Crim. Stats., § 437; Code,
1902, Crim. Code, § 555; Code, 1912, Crim. Code, § 794, prohibit any
spirituous, malt, vinous, fermented, brewed or other liquors and
beverages, or any compound or mixture thereof which contain alcohol.

Acts of 1917, No. 94, prohibits "any spirituous, malt, vinous, fer-
mented, brewed, or other liquors and beverages, or any compound or
mixture thereof which contains alcohol in excess of 1%."

5. Vermont:—Rev. Laws, 1880, § 3800, prohibited the sale of cider
at places of amusement. See *State* v. *Spaulding*, 61 Vt. 505.

Laws of 1902, No. 90, § 1, p. 94 (Gen. Laws, 1917, § 6452). " 'In-
toxicating liquors' . . . shall mean ale, porter, beer, lager beer,

within the limits we have stated, must decide upon the measures that are needful for the protection of its people, and, having regard to the artifices which are used to promote the sale of intoxicants under the guise of innocent

cider, all wines, any beverage which contains more than 1% of alcohol by volume."

6. Wyoming:—Compiled Stats., 1910, § 2838. "Any person who shall sell . . . any liquors, either spirituous, vinous, fermented, or malt, without a license, etc."

Sess. Laws of 1919, c. 25, § 2 (Prohibition). " 'Intoxicating liquor' . . . include any distilled, malt, spirituous, vinous, fermented, or alcoholic liquor and all alcoholic liquids . . . capable of being used as a beverage, which shall contain more than 1% of alcohol."

NOTE (f):—

North Dakota:—Rev. Code, 1895, § 7598, contains a proviso to the effect that fermented and alcoholic liquors containing less than 2% of alcohol by volume shall not be deemed to be intoxicating.

Laws of 1897, c. 65, § 10. "Courts will take judicial notice that beer is a malt liquor and intoxicating." See *State* v. *Currie*, 8 N. Dak. 545.

Rev. Code, 1899, § 7598, prohibits "all spirituous, malt, vinous, fermented, or other intoxicating liquors or mixtures thereof . . . that will produce intoxication, or any liquors . . . sold . . . as a beverage and which shall contain . . . methyl alcohol, . . . amyl alcohol, etc."

*State* v. *Virgo*, 14 N. Dak. 293 (1905), held that the act only applied to such liquors as were in fact intoxicating.

Laws of 1909, c. 187, p. 277. Intoxicating-liquors include alcohol, brandy, rum, beer, ale, porter, wine, and hard cider, also all spirituous, malt, etc., liquors, which will produce intoxication in any degree; or any mixture of such or any kind of beverage whatsoever which while preserving the alcoholic principle or any other intoxicating quality may be used as a beverage and may become a substitute for the ordinary intoxicating beverages.

*State* v. *Fargo Bottling Works*, 19 N. Dak. 397, held that "Purity Malt" containing 1.75% of alcohol "preserved the alcoholic principle" and whether or not it was intoxicating it might not lawfully be sold.

NOTE (g):—

Montana:—Laws of 1917, c. 143, § 2. " 'Intoxicating liquors'

beverages, it would constitute an unwarrantable departure from accepted principle to hold that the prohibition of the sale of all malt liquors, including the beverage in question, was beyond its reserved power." (P. 205.)

---

. . . include whisky, brandy, gin, rum, wine, ale, and spirituous, vinous, fermented, or malt liquors or liquid . . . which contain as much as 2% of alcohol by volume and is capable of being used as a beverage."

*State* v. *Centennial Brewing Co.*, 55 Montana, 500, holds specifically mentioned liquors prohibited regardless of alcoholic content.

Note (*h*):—

Rhode Island:—Pub. Laws of 1887, c. 634, § 2. "'Intoxicating liquors' . . . include wine, rum or other strong, or malt liquors, or any liquor or mixture which shall contain more than 2% by weight of alcohol" and this is not to be construed to permit the sale of liquors containing less than 2% if intoxicating.

Public Laws, 1919, c. 1740, § 1 (amending Gen. Laws, c. 123, § 1). "'Non-intoxicating beverages' as used in this act, includes and means all rectified spirits, wines, fermented and malt liquors which contain one percentum and not more than four percentum by weight of alcohol.

"Sec. 2. No person shall manufacture or sell or suffer to be manufactured or sold, or keep or suffer to be kept on his premises or possession or under his charge for the purposes of sale and delivery, any non-intoxicating beverages, unless as hereinafter provided."

"Sec. 5. The electors of the several cities and towns . . . shall . . . cast their ballots for or against the granting of licenses for the sale of non-intoxicating beverages pursuant to this act. . . ."

Maryland:—Laws of 1918, c. 219, p. 580 (prohibiting at night the sale of intoxicating liquors to be carried away from the place of sale). Expressly excludes from the operation of the act "malt liquors containing less than 4% of alcohol by weight."

This provision, however, is not attempting to make a classification of intoxicating liquors. For laws of this State which do that see Note *c*, (9) *supra*, 286, and note *d*, (8) *supra*, 290.

Note (*i*):—

1. Kentucky:—Statutes of 1903, § 2554, as amended by Laws of 1906, c. 21, forbids the sale in dry territory of "spirituous, vinous or malt liquors."

*City of Bowling Green* v. *McMullen*, 134 Kentucky, 742, held that the liquors named must be intoxicating in fact to be forbidden by the act.

That the Federal Government would, in attempting to enforce a prohibitory law, be confronted with difficulties similar to those encountered by the States is obvious; and both this experience of the States and the need of the Federal Government of legislation defining intoxicating liquors as was done in the Volstead Act were clearly set forth in the reports of the House Committee on the Judiciary in reporting the bill to the 65th Congress, 3d session, Report 1143, February 26, 1919, and to the 66th Congress, 1st session, Report 91, June 30, 1919. Furthermore, recent experience of the military forces had shown the necessity

---

2. Texas:—Rev. Stats. 1895, Art. 5060a, taxes the selling of "spirituous, vinous, or malt liquors, or medicated bitters capable of producing intoxication."

*Ex parte Gray,* 83 S. W. Rep. 828; *Reisenberg* v. *State,* 84 S. W. Rep. 585, held that non-intoxicating malt beverages may be sold without a license.

Gen. Laws, 1918, c. 24 (Prohibition), uses the same terms as the older statute and is cumulative, so presumably it has the same meaning.

3. Louisiana:—See Note *c* (8) *supra,* 286. The test of 2% applies only to near-beer. Presumably a vinous liquor must be proved intoxicating in fact under the decisions.

NOTE *(j)*:—

1. New Jersey:—Laws of 1918, c. 2, § 1 (Local Option). "The term 'intoxicating liquor' . . . shall mean any spirituous, vinous, malt, brewed, or any other intoxicating liquor."

No interpretations.

2. North Carolina:—Sp. Sess. 1908, c. 71, § 1. Prohibits the sale of "any spirituous, vinous, fermented, or malt liquors, or intoxicating bitters."

Pub. Laws, 1909, c. 438, Schedule B, §§ 26 and 63, imposed a license tax on the sale of "near-beer or any drinks containing ½ of 1% alcohol or more."

*Parker* v. *Griffith,* 151 N. Car. 600; *State* v. *Danenberg,* 151 N. Car. 718, held that the sale of near-beer containing 1½% of alcohol was lawful.

3. Pennsylvania:—No definition.

NOTE *(k)*:—

See Note *b, supra,* 283.

of fixing a definite alcoholic test for the purpose of administering the limited prohibitory law included in the Selective Service Act of May 18, 1917, c. 15, § 12, 40 Stat. 76, 82.[l] And the Attorney General, calling attention specifically to the claim made in respect to the 2.75 per cent. beer, had pointed out to Congress that definition of intoxicating liquor by fixed standards was essential to effective enforcement of the prohibition law.[m] It is there-

Note (l):—
That statute made it "unlawful to sell any intoxicating liquor, including beer, ale, or wine, to any officer or member of the military forces while in uniform." The Judge Advocate General having been applied to for an opinion concerning its administration advised that: In matters of military inquiry, the War Department regards a beverage that contains 1.4% of alcohol as intoxicating liquor within the meaning of § 12 of the Selective Service Act of May 18, 1917, and the regulations of the President and the Secretary of War made thereunder; whether beverages are intoxicating liquors  .  .  .  in prosecution of civilians is a question for the civil courts. (Opinions of Judge Advocate General, 250. December 4, 1918—Digest of 1918, p. 360.) See also opinion of March 3, 1919—Digest of 1919, p. 289.

Note (m):—
Referring to the proposed definition: "I do not think the wisdom of such action on the part of Congress admits of doubt. It goes without saying, I think, that if a law merely prohibits intoxicating liquors and leaves to the jury in each case, from the evidence produced, to determine whether the liquor in question is, in fact, intoxicating or not, its efficient and uniform administration will be impossible. The term 'intoxicating' is too indefinite and uncertain to produce anything like uniform results in such trials. Of course, there are certain liquors so generally known to be intoxicating that any court would take judicial notice of this fact. But in the absence of a definition by Congress there will be innumerable beverages as to which the claim will be made that they do not contain enough alcohol to render them intoxicating. These contentions will produce endless confusion and uncertainty. These, I think, are substantially the reasons why Congress should itself provide a definition.

"The importance of this matter has been very much emphasized by our present efforts to enforce the war prohibition act. The claim is being made that beer containing as much as 2¾ per cent. of alcohol is

fore clear both that Congress might reasonably have considered some legislative definition of intoxicating liquor to be essential to effective enforcement of prohibition and also that the definition provided by the Volstead Act was not an arbitrary one.

Plaintiff's argument is equivalent to saying that the war power of Congress to prohibit the manufacture and sale of intoxicating liquors does not extend to the adoption of such means to this end as in its judgment are necessary to the effective administration of the law. The contention appears to be, that since the power to prohibit the manufacture and sale of intoxicating liquors is not expressly granted to Congress, but is a power implied under § 8 of Article I of the Constitution, which authorizes Congress "to make all laws which shall be necessary and proper for carrying into execution" powers expressly enumerated, the power to prohibit non-intoxicants would be merely an incident of the power to prohibit intoxicants; and that it cannot be held to exist, because one implied power may not be grafted upon another implied power. This argument is a mere matter of words. The police power of a State over the liquor traffic is not limited to the power to prohibit the sale of intoxicating liquors supported by a separate implied power to prohibit kindred non-intoxicating liquors so far as necessary to make the prohibition of intoxicants effective; it is a single broad power to make such laws, by way of prohibition, as may be required to effectively suppress the traffic in intoxicating liquors. Likewise the im-

---

not intoxicating. And if this must be made a question of fact to be decided by each jury, but little in the way of practical results can be expected. I am, however, most earnestly insisting that, in view of the rulings for many years by the Internal Revenue Department, Congress meant when it used the word 'beer' a beverage of the class generally known as beer if it contained as much as one half of 1 per cent. of alcohol." Letter of Attorney General to Senator Morris Shepherd, July 29, 1919, read in Senate, September 5, 1919, 58 Cong. Rec. 5185.

plied war power over intoxicating liquors extends to the
enactment of laws which will not merely prohibit the sale
of intoxicating liquors but will effectually prevent their
sale. Furthermore, as stated in *Hamilton* v. *Kentucky
Distilleries & Warehouse Co., ante,* 156, while discussing
the implied power to prohibit the sale of intoxicating
liquors: "When the United States exerts any of the powers
conferred upon it by the Constitution, no valid objec-
tion can be based upon the fact that such exercise may
be attended by the same incidents which attend the exer-
cise by a State of its police power . . ."

The distinction sought to be made by plaintiff between
the scope or incidents of an express power and those of an
implied power has no basis in reason or authority. Thus,
the Constitution confers upon Congress the express power
"to establish post offices and post roads" (Article I, § 8,
clause 7). From this is implied the power to acquire land
for post offices in the several States, *Battle* v. *United States,*
209 U. S. 36; and as an incident of this implied power to
acquire land, the further power is implied to take it by
right of eminent domain. *Kohl* v. *United States,* 91 U. S.
367. Likewise, the Constitution confers by clause 3 the
express power "to regulate commerce . . . among the
several States"; but there is implied for this purpose also
the power to grant to individuals franchises to construct
and operate railroads from State to State. *California* v.
*Pacific R. R. Co.,* 127 U. S. 1, 39. Incidental to this implied
power to construct or authorize the construction of a rail-
road—is the further implied power to regulate the relations
of the railroad with its employees, *Second Employers'
Liability Cases,* 223 U. S. 1, 47; to require safety appliances
upon cars, even when used in intrastate commerce, *South-
ern Ry. Co.* v. *United States,* 222 U. S. 20; and to regulate
freight rates even to the extent of affecting intrastate rates,
*American Express Co.* v. *Caldwell,* 244 U. S. 617. Whether
it be for purposes of national defense, or for the purpose

of establishing post offices and post roads or for the purpose of regulating commerce among the several States Congress has the power "to make all laws which shall be necessary and proper for carrying into execution" the duty so reposed in the Federal Government. While this is a Government of enumerated powers it has full attributes of sovereignty within the limits of those powers. *In re Debs*, 158 U. S. 564. Some confusion of thought might perhaps have been avoided, if, instead of distinguishing between powers by the terms express and implied, the terms specific and general had been used. For the power conferred by clause 18 of § 8 "to make all laws which shall be necessary and proper for carrying into execution" powers specifically enumerated is also an express power. Since Congress has power to increase war efficiency by prohibiting the liquor traffic, no reason appears why it should be denied the power to make its prohibition effective.

*Second:* Does the fact that Title I of the Volstead Act took effect upon its passage render § 1 invalid as against the plaintiff? Prohibition of the manufacture of malt liquors with alcoholic content of one-half of one per cent. or more is permissible only because, in the opinion of Congress, the war emergency demands it. If, in its opinion, the particular emergency demands the immediate discontinuance of the traffic Congress must have the power to require such discontinuance. To limit the power of Congress so that it may require discontinuance only after the lapse of a reasonable time from the passage of the act would seriously restrict it in the exercise of the war powers. Hardship resulting from making an act take effect upon its passage is a frequent incident of permissible legislation; but whether it shall be imposed rests wholly in the discretion of the law-making body. That the prohibition of the manufacture of non-intoxicating beer, if permissible at all, may be made to take effect immediately follows necessarily from the principle acted upon in *Mugler* v. *Kansas*, 123

U. S. 623, 669, since the incidents attending the exercise
by Congress of the war power to prohibit the liquor traffic
are the same as those that attend the States' prohibition
under the police power.    In the *Mugler Case*, also, the
breweries were erected at a time when the State did not
forbid the manufacture of malt liquors; and there it was
alleged that the prohibition, which became effective
almost immediately, would reduce the value of one of the
breweries by three-fourths and would render the other of
little value.    Here, as there, the loss resulting to the plain-
tiff from inability to use the property for brewery purposes,
is an incident of the peculiar nature of the property and of
the war need which, we must assume, demanded that the
discontinuance of use be immediate.    Plaintiff cannot com-
plain because a discontinuance later would have caused
him a smaller loss.   This, indeed, appears to be conceded so
far as concerns the brewery and appurtenances.   The objec-
tion on the ground that the prohibition takes effect im-
diately is confined to the prohibition of the sale of the beer
on hand at the time of the passage of the act.    But as to
that also we cannot say that the action of Congress was
unreasonable or arbitrary.

Plaintiff contends however that even if immediate pro-
hibition of the sale of its non-intoxicating beer is within
the war power, this can be legally effected, only provided
compensation is made; and it calls attention to the fact
that in *Barbour* v. *Georgia*, 249 U. S. 454, 459, following
some earlier cases, the question was reserved whether,
under the police power, the States could prohibit the sale
of liquor acquired before the enactment of the statute.
It should, however, be noted that, among the judgments
affirmed in the *Mugler Case*, was one for violation of the
act by selling beer acquired before its enactment (see pp.
625, 627); and that it was assumed without discussion that
the same rule applied to the brewery and its product (p.
669).   But we are not required to determine here the limits

in this respect of the police power of the States; nor whether the principle is applicable here under which the Federal Government has been declared to be free from liability to an owner, "for private property injured or destroyed during war, by the operations of armies in the field, or by measures necessary to their safety and efficiency," *United States* v. *Pacific Railroad*, 120 U. S. 227, 239; in analogy to that by which States are exempt from liability for the demolition of a house in the path of a conflagration, see *Lawton* v. *Steele*, 152 U. S. 133, 136; or for garbage of value taken, *Reduction Co.* v. *Sanitary Works*, 199 U. S. 306; *Gardner* v. *Michigan*, 199 U. S. 325; or for unwholesome food of value destroyed, *North American Storage Co.* v. *Chicago*, 211 U. S. 306; *Adams* v. *Milwaukee*, 228 U. S. 572, 584; for the preservation of the public health. Here, as in *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, *supra*, there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use.

It is urged that the act is particularly oppressive in respect to the beer on hand, because the plaintiff was engaged in manufacturing and selling a non-intoxicating beverage expressly authorized by the President in his proclamation of December 8, 1917, and prohibited by him later, only when conservation of all the food products of the country became necessary. The facts afford no basis on which to rest the claim of an equity in the plaintiff's favor. The specific permission from the President to manufacture 2.75 per cent. beer was not on the ground that such beer was non-intoxicating; nor was it a declaration by him that this beer was in fact non-intoxicating. The permission extended to all "ale and porter" which, everyone knows, are intoxicating liquors." This permission to

NOTE (*n*):—

Webster defines ale as: "An intoxicating liquor made from an infusion of malt by fermentation and the addition of a bitter, usually

make 2.75 per cent. beer was withdrawn December 1, 1918, under proclamation of September 16, 1918; and no permission to manufacture specifically 2.75 per cent. beer was ever thereafter given by the President. His later proclamation (March 4, 1919) merely limited the prohibition of the use of foodstuffs to use in the production of "intoxicating liquors." Whether 2.75 per cent. beer was intoxicating was thus left by the President not only without a decision but without even an intimation. The statement of plaintiff that the 2.75 per cent. beer on hand was manufactured under permission of the President is wholly unfounded. It was not until July 1, 1919, when the War-Time Prohibition Act became operative in this respect, that there was any prohibition of the sale of any liquors. So far as appears, all the beer which the plaintiff had on hand at the time of the passage of the Volstead Act was manufactured by the plaintiff long after the President had ceased to have any authority to forbid or to permit.

*Decree affirmed.*

Mr. Justice McReynolds, with whom concurred Mr. Justice Day, and Mr. Justice Van Devanter, dissenting.

I cannot accept either the conclusion announced by the court or the reasons advanced to uphold it. The importance of the principles involved impels a dissent.

We are not now primarily concerned with the wisdom or validity of general legislation concerning liquors, nor with the intoxicating qualities of beer, nor with measures taken by a State under its inherent and wide general powers to provide for public safety and welfare. Our problem concerns the power of Congress and rights of the citizen after a declaration of war, but when active

hops;" and porter as: "A malt liquor, of dark color and moderately bitter taste, possessing tonic and intoxicating qualities."

hostilities have ended and demobilization has been completed.

The Government freely admits, since the present cause stands upon motion to dismiss a bill which plainly alleges that the beer in question is non-intoxicating, we must accept that allegation as true and beyond controversy. In *United States* v. *Standard Brewery*, decided this day, *ante*, 210, we rule in effect that for many months prior to the Volstead Act, passed October 28, 1919, no law of the United States forbade the production or sale of non-intoxicating malt liquors. And so the question for decision here distinctly presented, is this—Did Congress have power on October 28, 1919, directly and instantly to prohibit the sale of a non-intoxicating beverage, theretofore lawfully produced and which until then could have been lawfully vended, without making any provision for compensation to the owner?

The Federal Government has only those powers granted by the Constitution. The Eighteenth Amendment not having become effective, it has no general power to prohibit the manufacture or sale of liquors. But by positive grant Congress has been empowered: "To declare war," "to raise and support armies," "to provide and maintain a navy," "to make rules for the government and regulation of the land and naval forces," "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers"; and to these it is attempted to trace the asserted power to prohibit sale of complainant's beer. (See concerning implied powers, Cooley's Principles of Constitutional Law, 105; Story on the Constitution, 4th ed., § 1243.)

The argument runs—This court has held in *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, *ante*, 146, that under a power implied because necessary and proper to carry into execution the above named powers relating to war, in October, 1919, Congress could prohibit the sale

of intoxicating liquors. In order to make such a prohibition effective the sale of non-intoxicating beer must be forbidden. Wherefore, from the implied power to prohibit intoxicants the further power to prohibit this non-intoxicant must be implied.

The query at once arises: If all this be true, why may not the second implied power engender a third under which Congress may forbid the planting of barley or hops, the manufacture of bottles or kegs, etc., etc.? The mischievous consequences of such reasoning were long ago pointed out in *Kidd* v. *Pearson*, 128 U. S. 1, 21, where, replying to a suggestion that under the expressly granted power to regulate commerce, Congress might control related matters, it was said:

"The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market?"

For sixty years *Ex parte Milligan*, 4 Wall. 2, 120, 125, has been regarded as a splendid exemplification of the protection which this court must extend in time of war to rights guaranteed by the Constitution, and also as decisive of its power to ascertain whether actual military necessity justifies interference with such rights. The doctrines then clearly—I may add, courageously—announced, conflict with the novel and hurtful theory now promulgated. A few pertinent quotations from the opinion will accentuate the gravity of the present ruling.

"Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are *now*, after the lapse of more than seventy years, sought to be avoided. Those great and

good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority.

\* \* \* \* \* \* \* \*

"This nation, as experience has proved, cannot always remain at peace, and has no right to expect that it will always have wise and humane rulers, sincerely attached to the principles of the Constitution. Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right is conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate. If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them. They knew— the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged

at such a time, was especially hazardous to freemen. For this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written constitution the safeguards which time had proved were essential to its preservation. Not one of these safeguards can the President, or Congress, or the Judiciary disturb, except the one concerning the writ of *habeas corpus.*"

By considering the circumstances existing when the War-Time Prohibition Act was challenged, in order to reach the conclusion announced in *Hamilton* v. *Kentucky Distilleries & Warehouse Co., supra,* this court asserted its right to determine the relationship between such an enactment and the conduct of war; the decision there really turned upon an appreciation of the facts. And that the implied power to enact such a prohibitive statute does not spring from a mere technical state of war but depends upon some existing necessity directly related to actual warfare, was recognized. Treating that opinion as though it asserted the existence of a general power delegated to Congress to prohibit intoxicants, certain cases which declare our inability to interfere with a State in the exercise of its police power (*Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Silz* v. *Hesterberg,* 211 U. S. 31, etc.) are now cited, and it is said they afford authority for upholding the challenged statute. But those cases are essentially different from the present one, both as to facts and applicable principles; the power exercised by the States was inherent, ever present, limited only by the Fourteenth Amendment, and there was no arbitrary application of it; the power of Congress recognized in the *Hamilton Case,* and here relied upon must be inferred from others expressly granted and should be restricted, as it always has been heretofore, to actual necessities consequent upon war. It can only support a measure directly relating to such necessities and only so long as the relationship continues. Whether these

essentials existed when a measure was enacted or challenged, presents a question for the courts; and, accordingly, we must come to this ultimate inquiry:—Can it be truthfully said, in view of the well-known facts existing on October 28, 1919, that general prohibition immediately after that day of the sale of non-intoxicating beer theretofore lawfully manufactured, could afford any direct and appreciable aid in respect of the war declared against Germany and Austria?

What were the outstanding circumstances?   During the nineteen months—April, 1917, to November, 1918—when active hostilities were being carried on, and for almost a year thereafter, Congress found no exigency requiring it to prohibit sales of non-intoxicating beers.   The armistice was signed and actual hostilities terminated November 11, 1918.   Our military and naval forces, with very few exceptions, had returned and demobilization had been completed.   The production of war material and supplies had ceased long before and huge quantities of those on hand had been sold.   The President had solemnly declared, "The war thus comes to an end; for having accepted these terms of armistice, it will be impossible for the German command to renew it."   Also—"That the object of the war is attained."   "The quiet of peace and tranquility of settled hopes has descended upon us." July 10, 1919, he announced, "The war ended in November, eight months ago"; and in a message dated October 27, 1919, he declared that war emergencies which might have called for prohibition "have been satisfied in the demobilization of the army and navy."   Food supplies were abundant, and there is no pretense that the enactment under consideration was intended to preserve them. Finally, the statute itself contains no declaration that prohibition of non-intoxicants was regarded as in any way essential to the proper conduct or conclusion of the war or to restoration of peace.

Giving consideration to this state of affairs, I can see no reasonable relationship between the war declared in 1917, or the demobilization following (both of which in essence if not by formal announcement terminated before October, 1919) or restoration of peace (whose quiet had already descended upon us) and destruction of the value of complainant's beverage, solemnly admitted in this record to be non-intoxicating and which it manufactured, held and desired to sell in strict compliance with the laws of New York. Nor can I discover any substantial ground for holding that such destruction could probably aid in an appreciable way the enforcement of any prohibition law then within the competency of Congress to enact. It is not enough merely to assert such a probability; it must arise from the facts.

Moreover, well settled rights of the individual in harmless property and powers carefully reserved to the States, ought not to be abridged or destroyed by mere argumentation based upon supposed analogies. The Constitution should be interpreted in view of the spirit which pervades it and always with a steadfast purpose to give complete effect to every part according to the true intendment— none should suffer emasculation by any strained or unnatural construction. And these solemn words we may neither forget nor ignore—"Nor shall any person  .  .  . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

MR. JUSTICE CLARKE also dissents.