47

UNITED STATES of America,
Plaintiff,

v.

Everett STARLING, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Rolland THOMAS and Floyd Curnutt,
Defendants.

Thomas P. GRAHAM, Jr., Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL UNION 1281, AFL–CIO, Respondent.

Robert WOLFE, Margaret Wolfe, Ray G. Wolfe, Esther Wolfe, Warren Dice, Phyllis Dice, Kyle Gaylor and Bette Gaylor, partners d/b/a Wolfe's Department Store, Plaintiffs,

v.

MARYLAND CASUALTY COMPANY, a corporation, Defendant.

Cr. Nos. 3973, 3909,
Civ. Nos. A–15159, A–14734.

District Court, Alaska
Third Division, Anchorage.
Feb. 21, 1959.

---

Crim. Nos. 3973, 3909:

George F. Boney, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

T. Stanton Wilson, Wilson & Wilson, Anchorage, Alaska, and Wendell P. Kay, Anchorage, Alaska, for defendant Starling.

Raymond E. Plummer and James J. Delaney, Plummer & Delaney, Anchorage, Alaska, for defendants Thomas and others.

Civ. No. A–15,159:

Charles M. Henderson, Atty., N. L. R. B., Seattle, Wash., George F. Boney, Asst. U. S. Atty., Anchorage, Alaska, for petitioner.

Gordon W. Hartlieb, Hartlieb, Groh & Rader, Anchorage, Alaska, for respondent.

Civ. No. A–14,734:

David H. Thorsness, Davis, Hughes & Thorsness, Anchorage, Alaska, for plaintiffs.

James J. Delaney, Plummer & Delaney, Anchorage, Alaska, for defendant.

McCARREY, District Judge.

These cases come before the court on a motion to dismiss based upon the grounds that since Alaska was admitted to the Union as a state on the 3d day of January 1959, by presidential proclamation, the United States District Court for the Territory of Alaska is now without federal jurisdiction over criminal and civil matters arising under the laws of the United States.

The court, on its own motion, ordered the above four cases consolidated for the sole purpose of deciding the jurisdiction question common to all of them.

Criminal No. 3973, United States of America v. Everett Starling, comes before the court on a grand jury indictment, as follows:

"That during the period from April, 1957, to April, 1958, at or near Elmendorf Air Force Base, near Anchorage, Third Judicial Division, District of Alaska, Everett Starling being then and there an employee of Branch 40 Exchange Service Station, an agency of the United States, and as a part of his employment being charged with the duty to act as cashier; further that as cashier it being the duty of said Everett Starling to receive monies earned in the course of the sale of gasoline and gasoline by-products and to account for said monies received; said Everett Starling did wilfully, unlawfully, and feloniously and with intent to defraud said Branch 40 Exchange Service Station, did embezzle said monies in

the sum of approximately One Thousand Dollars ($1,000.00), the exact amount being unknown to the Grand Jury, said monies being the property of said Branch 40 Exchange Service Station."

This indictment was brought under section 641, title 18, U.S.C.A.

Criminal No. 3909, United States of America v. Rolland Thomas and Floyd Curnutt, comes before the court by way of information, in conformance with the law, and charges the defendants with the following crime:

"That on or about the 27th day of June, 1958 in Nushagak Bay, Third Judicial Division, District of Alaska, Rolland Thomas and Floyd Curnutt did engage unlawfully in salmon fishing with commercial gear in a closed area, to-wit: That the said Rolland Thomas and Floyd Curnutt did make a set and did fish with a drift gill net in Nushagak Bay outside of and southeast of a line between the white Coast and Geodetic Survey markers located near Nichols Hills and Etolin Point, respectively."

This information charges a violation of title 50, Code of Federal Regulations, section 104.2.

Civil No. A–15,159, Thomas P. Graham, Jr., Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board v. United Brotherhood of Carpenters and Joiners of America, Local Union 1281, AFL–CIO, comes before the court upon a petition filed by Thomas P. Graham, Regional Director of the Nineteenth Region of the National Labor Relations Board, who seeks an injunction against the defendant, United Brotherhood of Carpenters and Joiners of America, Local Union 1281, AFL–CIO, under section 10($l$) of the National Labor Relations Act, as amended. See 29 U.S.C.A. § 160($l$).

Civil No. A–14,734, Robert Wolfe, Margaret Wolfe, Ray G. Wolfe, Esther Wolfe, Warren Dice, Phyllis Dice, Kyle Gaylor and Bette Gaylor, partners d/b/a Wolfe's Department Store v. Maryland Casualty Company, a corporation, comes before the court upon a complaint for declaratory judgment under the Federal Declaratory Judgment Act, which specifically applies to Alaska. 28 U.S.C.A. § 2201.

Congress established a district court for the District of Alaska with the jurisdiction of district courts of the United States, and with general jurisdiction in civil, criminal, equity and admiralty "causes", and divided the territory into four (4) divisions, " * * * which shall also be recording divisions." 48 U.S.C.A. § 101.

The judges who are appointed to preside over these courts are "appointed by the President, by and with the advice and consent of the Senate, and shall hold their respective offices for the term of four years and until their successors are appointed and qualified, unless sooner removed by the President for cause." 48 U.S.C.A. § 112.

It is patent that the present functioning courts in Alaska are legislative in character, established under article IV, sec. 3, of the United States Constitution, and not under article III, sec. 1 of the United States Constitution. See McAllister v. United States, 1891, 141 U.S. 174, 11 S.Ct. 949, 35 L.Ed. 693.

The proponents of the motions to dismiss for want of jurisdiction claim that section 18 of the Alaska Statehood Bill (Public Law 85–508, sec. 18, 85th Congress, July 7, 1958) is void on three grounds:

1. It is a violation of article 3, sec. 1, of the United States Constitution, which provides that federal judges in federal courts (at least in admitted states) shall hold office during good behavior.

2. It is a violation of the privileges and immunities clause of the United States Constitution, article 4, sec. 2, in that the citizens of all the other states in the Union enjoy the benefits of a federal judge with life tenure, a benefit

which Alaska as a state is deprived of for a three-year transitional period.

3. It is a denial of due process of law under the fifth amendment, United States Constitution, for a person charged with a federal crime in an admitted state, or a civil action belonging in a federal court and begun in an admitted state, to be tried by a federal judge with anything less than life tenure. The reason for the lack of due process is that a federal judge of less than life tenure will not have the independence that a federal judge with life tenure has and, thus, his decisions might be influenced by other than legal considerations.

After many years of petitioning Congress for admission into the Union, Alaska was admitted on July 7, 1958, upon the condition that her electorate approve the Statehood Act as it was passed by Congress (Public Law 85–508, 85th Congress, H.R. 7999, July 7, 1958). Prior to her admission, Alaska held a constitutional convention in accordance with chapter 46, Session Laws of Alaska 1955. Under ordinance 2, section 24, article 15, of the Alaska constitution, which emerged from this convention and was adopted by the voters, Alaska sent two senators and a congressman to Washington under a plan called the Alaska-Tennessee Plan, in order to gain further recognition. On August 26, 1958, the voters, by a substantial majority, approved the Statehood Act and all its conditions.

It is to be noted (but without an attempt to individually set forth all of them) that Alaska was admitted into the Union upon certain conditions, some of which were specifically approved by the voters, and others which were not specifically approved. The boundaries of the State of Alaska and the national defense withdrawal provisions of the Statehood Bill are examples of conditions specifically approved. See section 8(b), Alaska Statehood Bill supra. Section 4 of the Statehood Bill relating to claims against the United States, jurisdiction of Indian lands, taxes on lands of the United States, section 6(e) pertaining to

the retention of control of the Alaska fisheries for an indeterminate period in the Department of the Interior, section 6(h) pertaining to mineral leases, permits, etc., and section 18 of the Statehood Bill pertaining to the judiciary, are examples of conditions not specifically approved by the voters, 48 U.S.C.A. note preceding section 23.

Unlike Hawaii, the Territory of Alaska did not create and organize its own territorial court system prior to its admission into the Union. Therefore, the only court system functioning on Alaska's admittance into the Union, with the exception of municipal courts, was that of the United States District Court for the Territory of Alaska. This factor compelled Congress and the Territory of Alaska to provide for an orderly judicial system for both the federal government and the new State of Alaska during the period of transition. Otherwise, a hiatus would be existent. What would be more economical, logical and practical than to have these two sovereignties provide that the present existing court system would assume the temporary court functions. The constitution of Alaska, in this respect, provides as follows:

"Article XV

"Schedule Of Transitional Measures

"To provide an orderly transition from a territorial to a state form of government, it is declared and ordained:

"Section 1. *Continuance of laws.* All laws in force in the Territory of Alaska on the effective date of this constitution and consistent therewith shall continue in force until they expire by their own limitation, are amended, or repealed.

"Section 2. *Saving of existing rights and liabilities.* Except as otherwise provided in this constitution, all rights, titles, actions, suits, contracts, and liabilities and all civil, criminal, or administrative proceedings shall continue unaffected by the change from territorial to state government, and the State shall be the

legal successor to the Territory in these matters.

"Section 3. *Local government.* Cities, school districts, health districts, public utility districts, and other local subdivisions of government existing on the effective date of this constitution shall continue to exercise their powers and functions under existing law, pending enactment of legislation to carry out the provisions of this constitution. New local subdivisions of government shall be created only in accordance with this constitution.

"Section 4. *Continuance of office.* All officers of the Territory, or under its laws, on the effective date of this constitution shall continue to perform the duties of their offices in a manner consistent with this constitution until they are superseded by officers of the State.

"Section 5. *Corresponding qualifications.* Residence, citizenship, or other qualifications under the Territory may be used toward the fulfillment of corresponding qualifications required by this constitution.

\*   \*   \*   \*   \*   \*

"Section 17. *Transfer of court jurisdiction.* Until the courts provided for in Article IV are organized, the courts, their jurisdiction, and the judicial system shall remain as constituted on the date of admission unless otherwise provided by law. When the state courts are organized, new actions shall be commenced and filed therein, and all causes, other than those under the jurisdiction of the United States, pending in the courts existing on the date of admission, shall be transferred to the proper state court as though commenced, filed, or lodged in those courts in the first instance, except as otherwise provided by law."

"Article IV

"The Judiciary

"Section 1. *Judicial power and jurisdiction.* The judicial power of the State is vested in a supreme court, a superior court, and the courts established by the legislature. The jurisdiction of courts shall be prescribed by law. The courts shall constitute a unified judicial system for operation and administration. Judicial districts shall be established by law."

Congress, in the Alaska Statehood Act, supra, in this same respect, provided as follows:

"Sec. 12. Effective upon the admission of Alaska into the Union—

"(a) The analysis of chapter 5 of title 28, United States Code, immediately preceding section 81 of such title, is amended by inserting immediately after and underneath item 81 of such analysis, a new item to be designated as item 81A and to read as follows:

" '81A. Alaska';

"(b) Title 28, United States Code, is amended by inserting immediately after section 81 thereof a new section, to be designated as section 81A, and to read as follows:

" '81A. Alaska

" 'Alaska constitutes one judicial district.

" 'Court shall be held at Anchorage, Fairbanks, Juneau, and Nome.';

"(c) Section 133 of title 28, United States Code, is amended by inserting in the table of districts and judges in such section immediately above the item: 'Arizona \* \* \* 2,' a new item as follows: 'Alaska \* \* \* 1';

"(d) The first paragraph of section 373 of title 28, United States Code, as heretofore amended, is further amended by striking out the words: 'the District Court for the Territory of Alaska,': *Provided,* That the amendment made by this subsection shall not affect the rights of any judge who may have retired before it takes effect;

"(e) The words 'the District Court for the Territory of Alaska,' are stricken out wherever they appear in sections 333, 460, 610, 753, 1252, 1291, 1292, and 1346 of title 28, United States Code;

"(f) The first paragraph of section 1252 of title 28, United States Code, is further amended by striking out the word 'Alaska,' from the clause relating to courts of record;

"(g) Subsection (2) of section 1294 of title 28, United States Code, is repealed and the later subsections of such section are renumbered accordingly;

"(h) Subsection (a) of section 2410 of title 28, United States Code, is amended by striking out the words: 'including the District Court for the Territory of Alaska,';

"(i) Section 3241 of title 18, United States Code, is amended by striking out the words: 'District Court for the Territory of Alaska, the';

"(j) Subsection (e) of section 3401 of title 18, United States Code, is amended by striking out the words: 'for Alaska or';

"(k) Section 3771 of title 18, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: 'the Territory of Alaska,';

"(l) Section 3772 of title 18, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: 'the Territory of Alaska,';

"(m) Section 2072 of title 28, United States Code, as heretofore amended, is further amended by striking out from the first paragraph of such section the words: 'and of the District Court for the Territory of Alaska';

"(n) Subsection (q) of section 376 of title 28, United States Code, is amended by striking out the words: 'the District Court for the Territory of Alaska,': *Provided,* That the amendment made by this subsection shall not affect the rights under such section 376 of any present or former judge of the District Court for the Territory of Alaska or his survivors;

"(o) The last paragraph of section 1963 of title 28, United States Code, is repealed;

"(p) Section 2201 of title 28, United States Code, is amended by striking out the words: 'and the District Court for the Territory of Alaska'; and

"(q) Section 4 of the Act of July 28, 1950 (64 Stat. 380; 5 U.S.C. sec. 341b) is amended by striking out the word: 'Alaska,'.

"Sec. 13. No writ, action, indictment, cause, or proceeding pending in the District Court for the Territory of Alaska on the date when said Territory shall become a State, and no case pending in an appellate court upon appeal from the District Court for the Territory of Alaska at the time said Territory shall become a State, shall abate by the admission of the State of Alaska into the Union, but the same shall be transferred and proceeded with as hereinafter provided.

"All civil causes of action and all criminal offenses which shall have arisen or been committed prior to the admission of said State, but as to which no suit, action, or prosecution shall be pending at the date of such admission, shall be subject to prosecution in the appropriate State courts or in the United States District Court for the District of Alaska in like manner, to the same extent, and with like right of appellate review, as if said State had been created and said courts had been established prior to the accrual of said causes of action or the commission of such offenses; and such of said criminal offenses as shall have been committed against the laws of the

Territory shall be tried and punished by the appropriate courts of said State, and such as shall have been committed against the laws of the United States shall be tried and punished in the United States District Court for the District of Alaska.

"Sec. 14. All appeals taken from the District Court for the Territory of Alaska to the Supreme Court of the United States or the United States Court of Appeals for the Ninth Circuit, previous to the admission of Alaska as a State, shall be prosecuted to final determination as though this Act had not been passed. All cases in which final judgment has been rendered in such district court, and in which appeals might be had except for the admission of such State, may still be sued out, taken, and prosecuted to the Supreme Court of the United States or the United States Court of Appeals for the Ninth Circuit under the provisions of then existing law, and there held and determined in like manner; and in either case, the Supreme Court of the United States, or the United States Court of Appeals, in the event of reversal, shall remand the said cause to either the State supreme court or other final appellate court of said State, or the United States district court for said district, as the case may require: *Provided,* That the time allowed by existing law for appeals from the district court for said Territory shall not be enlarged thereby.

"Sec. 15. All causes pending or determined in the District Court for the Territory of Alaska at the time of the admission of Alaska as a State which are of such nature as to be within the jurisdiction of a district court of the United States shall be transferred to the United States District Court for the District of Alaska for final disposition and enforcement in the same manner as is now provided by law with reference to the judgments and decrees in ex-

isting United States district courts. All other causes pending or determined in the District Court for the Territory of Alaska at the time of the admission of Alaska as a State shall be transferred to the appropriate State court of Alaska. All final judgments and decrees rendered upon such transferred cases in the United States District Court for the District of Alaska may be reviewed by the Supreme Court of the United States or by the United States Court of Appeals for the Ninth Circuit in the same manner as is now provided by law with reference to the judgments and decrees in existing United States district courts.

"Sec. 16. Jurisdiction of all cases pending or determined in the District Court for the Territory of Alaska not transferred to the United States District Court for the District of Alaska shall devolve upon and be exercised by the courts of original jurisdiction created by said State, which shall be deemed to be the successor of the District Court for the Territory of Alaska with respect to cases not so transferred and, as such, shall take and retain custody of all records, dockets, journals, and files of such court pertaining to such cases. The files and papers in all cases so transferred to the United States district court, together with a transcript of all book entries to complete the record in such particular cases so transferred, shall be in like manner transferred to said district court.

"Sec. 17. All cases pending in the District Court for the Territory of Alaska at the time said Territory becomes a State not transferred to the United States District Court for the District of Alaska shall be proceeded with and determined by the courts created by said State with the right to prosecute appeals to the appellate courts created by said State, and also with the same right to prosecute appeals or writs of cer-

tiorari from the final determination in said causes made by the court of last resort created by such State to the Supreme Court of the United States, as now provided by law for appeals and writs of certiorari from the court of last resort of a State to the Supreme Court of the United States.

"Sec. 18. The provisions of the preceding sections with respect to the termination of the jurisdiction of the District Court for the Territory of Alaska, the continuation of suits, the succession of courts, and the satisfaction of rights of litigants in suits before such courts, shall not be effective until three years after the effective date of this Act, unless the President, by Executive order, shall sooner proclaim that the United States District Court for the District of Alaska, established in accordance with the provisions of this Act, is prepared to assume the functions imposed upon it. During such period of three years or until such Executive order is issued, the United States District Court for the Territory of Alaska shall continue to function as heretofore. The tenure of the judges, the United States attorneys, marshals, and other officers of the United States District Court for the Territory of Alaska shall terminate at such time as that court shall cease to function as provided in this section."

In conformance with the authority of the Statehood Act supra, Alaska held a general election on the 25th day of November 1958 and was admitted to the Union by a proclamation of the President of the United States, Dwight D. Eisenhower, on the 3d day of January 1959, pursuant to congressional authorization. See Alaska Statehood Bill, supra.

Before proceeding to the question presented to the court for determination, which is momentous and complicated, I wish to advise that research facilities are limited because of the inadequacies of our library, both as to the early case law

and the subject of constitutional history. Because of the foregoing, I am only able to study the conditions, together with enabling legislation, of eleven of the other territories which have been admitted to the Union. In this respect, I wish to point out that I am unable to find another parallel factual situation. Thus, this opinion is written within these limitations.

I am constrained at this juncture to briefly discuss the generally accepted differences between an article III (constitutional) and an article IV (legislative) court, supra, as a background before discussing the presumption of constitutionality, decisions of the courts and the rationale to be used in deciding this constitutional issue.

■ The concept of the legislative court was initially an invention. American Insurance Co. v. Canter, 1828, 1 Pet. 511, 26 U.S. 511, 7 L.Ed. 242. It is a fiction in our constitutional law, invented and developed, like other creatures of judicial legislation, to temper law with justice in the immediate case, or to fill a constitutional void. See 10 George Washington Law Review 799 (May 1942).

The chief recognized differences between the two types of courts are:

1. The tenure of office of the judges, which in a constitutional court is during good behavior, and in some legislative courts is for a designated term.

2. The location of the legislative courts, i. e. in the territories and possessions, such as Alaska, Hawaii, Guam, Puerto Rico, Canal Zone, etc.

3. The jurisdiction of the legislative courts, i. e. court of claims, court of customs, and the courts created in the District of Columbia, etc.

However, George H. Watson, in his article on "The Concept of the Legislative Court" (George Washington Law Review, supra, at 807) says that " *    * A distinction such as that between legislative and constitutional courts is fundamentally conceptual and only secondarily based upon observable differences".

Congress has never set up a legislative court with jurisdiction in a single state, although it has done so with groups of states and the United States as a whole. The Court of Claims, Court of Patent Appeals and the Court of Private Land Claims are examples of legislative courts which had or have jurisdiction reaching into the states.

Congress established the Court of Private Land Claims, which consisted of five judges who were appointed for a limited term. It was given jurisdiction to determine various and sundry claims upon lands in the territories of Arizona, New Mexico and Utah, and in the states of Wyoming, Colorado and Nevada, which allegedly arose out of Spanish or Mexican land grants. The United States, through treaties with Mexico, had agreed to recognize these disputed land grants. The Supreme Court of the United States sustained the jurisdiction of that court in a case involving land in a territory, but left open the question of the power of Congress to make such provisions with respect to land in a state. United States v. Coe, 1894, 155 U.S. 76, 15 S.Ct. 16, 39 L.Ed. 76. In Ex parte Bakelite Corp., 1929, 279 U.S. 438, at page 456, 49 S.Ct. 411, at page 415, 73 L.Ed. 789, in referring to the Coe case, Justice Van Devanter, stated as follows:

"And, while that case related to lands in a territory, there can be no real doubt that the same rule would apply were the lands *in a state*. (Emphasis supplied.) The obligation of the United States would be the same in either case and Congress would have the same discretion respecting the mode of fulfilling it. In fact, the act creating the court included within its jurisdiction all claims within three states as well as those within three territories, and the court adjudicated all within these limits that were brought before it within the periods fixed by Congress."

Congress has established federal courts under article III, section 1, United States Constitution, throughout the United States. However, it is to be noted that this authority is not exclusive since the legislative courts in the District of Columbia are also article III courts, exercising all the judicial power of the United States. Keller v. Potomac Electric Co., 1923, 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731; Postum Cereal Co. v. California Fignut Co., 1927, 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478; O'Donoghue v. United States, 1933, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356. Thus a legislative court properly established under the Constitution may also be an article III court.

The District Court for the Territory of Alaska has come in recent years to be regarded as almost a "court of the United States". After the decision in Reese v. Fultz, D.C.1951, 96 F.Supp. 449, 450, 13 Alaska 227 and United States v. Bell, D.C.1952, 108 F.Supp. 777, 14 Alaska 142, which held this territorial court not to be a "court of the United States", two recent decisions limited their doctrine to that specific statutory language "court of the United States".

Judge Folta, in the first division of the District Court for the District of Alaska, in the case of Juneau Spruce Corp. v. International Longshoremen's and Warehousemen's Union, 1949, 83 F.Supp. 224, 12 Alaska 260, held that the provision of the Taft Hartley Act (sec. 303(b)), 29 U.S.C.A. § 187(b), permitting any person injured by violation thereof to sue in any "district court of the United States", comprehended the United States District Court for the Territory of Alaska. This decision was affirmed by the Ninth Circuit Court of Appeals, in 1951, 189 F.2d 177, 13 Alaska 291, and reaffirmed by the Supreme Court of the United States, in 1952, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275, 13 Alaska 536.

This court held in United States v. King, D.C.1954, 119 F.Supp. 398, 399, 14 Alaska 500, on a counterclaim brought under the provisions of the Tucker Act, that "district courts" included the District Court for the District of Alaska, under the provisions of the Tucker Act which provided that district courts "shall

have original jurisdiction concurrent with the court of claims". 28 U.S.C.A. § 1346.

Thus, as Mr. Watson has stated, the distinction between legislative and constitutional courts " * * * is fundamentally conceptual and only secondarily based upon observable differences". 10 Georgetown Law Review supra.

Alaska is now a state of the great Union which constitutes the United States. An orderly, continuous transition is mandatory, not only for the advantage of the new State of Alaska, but also for the benefit and well being of her sister states. The federal government, directly, has also much more than a casual interest, because of Alaska's strategic geographical location. It also has a vital interest in Alaska's adopting a methodical and orderly assumption of full state governmental functions.

No doubt the Territory of Alaska was remiss in not attempting to organize and set up its own territorial court system, as did Hawaii supra. Wisely, Congress and the new state, in the adoption of section 18, supra, provided for this.

When faced with obstacles Alaskans have never been dismayed. No territorial development in recorded history is more challenging than that of Alaska. In spite of great distances, lack of transportation and communication, the most obstinate forces of nature, coupled with the short working seasons and the long winter months, her citizens have not been deterred. Now they are challenged with complete self government. Although this came suddenly and, frankly, unexpectedly, it nevertheless came, belatedly. The impact is awe-inspiring.

The basic concept and rule of thumb of a well organized society is law and order. Alaska is particularly known for the varied and rugged individualistic will of her citizens. Many came north because of this. Alaska is now calling upon these same individualists to concertedly agree upon a basic and yet realistic judicial system within the limitations of her present constitution. She has many other basic problems of self government.

While man, with the aid of a higher Being, and through his own ingenuity, is now able to conduct a "push button" war, he has made little progress in forcing the will of man.

Let us then apply the admitted precept to the problem. Our republican form of government has defended, with vigor, the rights of the individual and particularly the right to individual thought. What could add more to the dignity of man and the right of individualistic expression than time? Time for orderly consideration. What could be more economical, logical and practical than to have these two sovereignties provide that the present existing court system would assume the temporary court functions?

█ The first burden that the proponents of the motions to dismiss must surmount is the presumption in favor of constitutionality that attaches to all federal statutes. This presumption must be rebutted beyond a reasonable doubt. See Chrestensen v. Valentine, D.C.N.Y. 1940, 34 F.Supp. 596; United States v. Whiting Milk Co., D.C.Mass.1937, 21 F. Supp. 321; United States v. Josephson, D.C.N.Y.1947, 74 F.Supp. 958; United States v. Taylor, D.C.N.Y.1954, 123 F. Supp. 920; and In re Royal Wilhelm Furniture Co., D.C.Mich.1938, 23 F.Supp. 993, where the court said the power to declare congressional acts unconstitutional belongs peculiarly to the appellate courts. This presumption in favor of constitutionality is similar to the presumption of innocence a defendant enjoys in a criminal case, and I find it takes precedence over the rule that jurisdiction must be strictly construed. The constitutionality presumption, however, is rebuttable. See Miller v. Howe Sound Mining Co., D.C.Wash.1948, 77 F.Supp. 540.

█ I find that the proponents of the motions to dismiss have failed to meet their burden by showing that section 18 of the Alaska Statehood Bill, supra, is unconstitutional beyond a reasonable doubt.

The main thrust of their attack is centered in two cases. Benner v. Porter, 1849, 9 How. 235, 50 U.S. 235, 13 L.Ed. 119 and Forsyth v. United States, 1850, 9 How. 571, 50 U.S. 571, 13 L.Ed. 262. The rule in these cases and, in fact the justification for the existence of "legislative courts", is found in the case of American Insurance Co. v. Canter, supra. This case was decided by Chief Justice Marshall in the twilight of his greatness and its doctrine might well be subject to question (see 7 Hastings Law Journal 62 (1955) and 10 George Washington Law Review 799 (1942)), if it were not for the long line of precedents and usage that has evolved based upon it. See United States v. Midwest Oil Co., 1915, 236 U.S. 459, at pages 472–473, 35 S.Ct. 309, at pages 312–313, 59 L.Ed. 673. Still the door is not completely closed to the Canter case, supra, being overruled. See Swift v. Tyson, 1842, 16 Pet. 1, 41 U.S. 1, 10 L.Ed. 685, and Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; National Mutual Insurance Co. of District of Columbia v. Tidewater Co., 1949, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556.

The pertinent facts in the Canter case, supra, were that Congress had vested admiralty jurisdiction in the superior courts of the Territory of Florida, whose judges held office for four-year terms. This territorial court decided a salvage claim, an admiralty action, and the losing parties attacked its jurisdiction on appeal, contending that because its judges did not hold life tenure the court was void under the terms of article 3, section 1, United States Constitution. Marshall, in order to sustain jurisdiction, a trait for which he was already famous, discovered the doctrine of "legislative courts". He held that courts established under article 3, section 1, United States Constitution, with life tenure judges, must exercise federal jurisdiction only in states already admitted to the Union. But in the territories, article 3, section 1, United States Constitution, does not apply and Congress, under article 4, section 3, United States Constitution, which pro-

vides for the government of the territories, may create federal courts with judges of less than life tenure. This holding sustained federal jurisdiction in the instant case, but it created a doctrine which was unfounded in constitutional history (see Hastings Law Journal and George Washington Law Review, supra) and which has created much mischief and fine legal distinctions since. See McAllister v. United States, 1891, 141 U.S. 174, 11 S.Ct. 949, 35 L.Ed. 693; United States v. Coe, 1894, 155 U.S. 76, 15 S.Ct. 16, 39 L.Ed. 76; Ex parte Bakelite Corporation, 1929, 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789.

The Benner and Forsyth cases, supra, were direct outgrowths of the Canter case supra. In the Benner case, Porter filed a libel in personam in admiralty in the Superior Court for the Southern District of Florida, a territorial court vested with admiralty jurisdiction, on the 24th of March 1846, against Benner, for the proceeds of the sloop Texas. This was an outfitters or suppliers lien action and the court awarded judgment on the 22nd of May 1846. On the 14th of May 1847, the cause was transferred to the District Court of the United States for Florida, and an appeal was taken. Prior to these events, Florida was unconditionally admitted to the Union on March 3, 1845. When Florida entered the Union on this date, she had a system of state courts ready to go into immediate operation and a federal district court for the District of Florida was in existence, but no judge had yet been appointed. The federal judge was not appointed by the President until approximately seventeen months after the admission of Florida into the Union, and the prior territorial courts, without any carry-over provision in the Florida statehood act, as provided in section 18 of the Alaska Statehood Act, supra, to support them, continued to hear federal matters including the instant case. Justice Nelson, speaking for a unanimous court, held that upon the *unconditional* admission of Florida into the Union, the territorial courts *immediately* lost all their jurisdiction (emphasis

mine). The holding in the Forsyth case is exactly the same as the holding in the Benner case and it is specifically predicated on the decision in the Benner case. Factually the Forsyth case differs from the Benner case in that a federal criminal violation was its subject matter rather than an admiralty action. This fact, however, is of no moment.

This court believes that the two holdings (Benner and Forsyth supra) are dicta as far as the present Alaska cases are concerned. Alaska was not unconditionally admitted into the Union as witness the number of conditions in the statehood bill enumerated, supra. There is, of course, a serious question whether any conditions in the statehood bill need be obeyed by a state once it is admitted into the Union. The case of Coyle v. Secretary of State of Oklahoma, 1911, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 indicates that provisions for the location of a state capitol in a statehood bill are not binding on a state once it is admitted to the Union. The answer to the question of whether or not any conditions in a statehood bill are binding is unnecessary to the determination of the question of whether Benner v. Porter supra, is dicta as it applies to the Alaska situation. What is important is that Justice Nelson, in his opinion in the Benner case noted the lack of any major conditions on the admittance of Florida into the Union and rendered his decision in accordance with this factor.

Further evidence that the Benner case is dicta occurs 9 How. on page 240 of the opinion, where Justice Nelson states:

"The objection to the jurisdiction taken by the respondents, however, is, not that the acts of Congress were insufficient to confer the power exercised by the courts, but that the acts had been abrogated and the jurisdiction superseded at the time of the rendition of the decree, by the admission of the Territory of Florida, as a State, into the Union, and were no longer in force."

In the instant case we have an act of Congress, section 18 of the statehood bill, supra, which confers transitional jurisdiction.

At page 245 of 9 How. Justice Nelson again illustrates that his decision in the Benner case is dicta as far as it concerns Alaska:

"We have chosen to place the decision upon the effect of the admission of the State with a government already organized under her constitution, and prepared to go into immediate operation, because such is the case presented on the record; but we do not thereby intend to imply or admit that a different conclusion would have been reached if it had been otherwise, and the State had come into the Union with nothing but her organic law, leaving the organization of her government under it to a future period."

Alaska may have come into the Union with little more than her organic law. The State of Alaska has conveyed temporary jurisdiction over state judicial matters to the federal territorial court, by the terms of section 17, article 15, supra. By one interpretation of section 18 of the Alaska Statehood Act, supra, if this court is determined to have no federal jurisdiction and the President immediately appoints a permanent life-tenure federal judge, one could ably argue that the territorial court might lose all its jurisdiction, both state and federal. Without a state court system, Alaska would certainly have entered the Union with little more than her organic law, at least as far as her courts were concerned.

It has been argued that if the Benner and the Forsyth cases, supra, are dicta, they are persuasive dicta, and with this I agree. However, when approaching a constitutional problem of this significance, it is best to put dicta, no matter how persuasive, in its historical setting in order to determine if the reasons for the dicta are still applicable today. During Chief Justice Marshall's reign in the Supreme Court, there was a strong federal trend as opposed to the principle of states' rights, at least as far as the judicial system was concerned. Marshall

is largely remembered as a strong federalist whose authority made our court system what it is today. One of the laws of physics is that to every action there is an equal and opposite reaction, and, beginning with President Jackson's tenure in the presidency, states' rights were strongly emphasized. This emphasis on states' rights persisted until the beginning of the Civil War. The effect on the Supreme Court of this emphasis on states' rights and the westward frontier movement was to evidence itself by the Court's turning to strict and legalistic constructions of the Constitution. During Marshall's term on the Court, he used the Constitution as a basis only for his broad strokes of judicial genius. With his passing the cases reflect a view of the Constitution as an essentially limiting document within which judicial doctrine should develop, rather than as a basis from which judicial doctrine should expand. This is obviously an oversimplification of the subtle differences in the Supreme Court's approach to constitutional problems in its early history, but it does set the Canter, Benner and Forsyth cases, supra, in their proper historical perspective.

It is this court's view that the approach of the courts today to constitutional construction is that of the Marshall Court rather than the one that Justice Nelson sat on. See United States v. Classic, 1941, 313 U.S. 299, at page 316, 61 S.Ct. 1031, at page 1038, 85 L.Ed. 1368, where Justice Stone said:

> "If we remember that 'it is a Constitution we are expounding', we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose."

With this approach in mind, I shall attempt to answer the three constitutional objections raised.

I find that section 18 of the Alaska Statehood Act suspends the operation of sections 12 through 17 of said act until the President by Executive order establishes the United States District Court for the District of Alaska and appoints a permanent federal judge to sit therein.

The three constitutional objections to the continued jurisdiction of the present District Court for the District of Alaska in federal matters are primarily based on the fact that the four federal judges in Alaska do not hold life tenure. In every other respect, at least as regards its functioning as a federal court, the District Court for the District of Alaska has equal powers with any federal court in the United States except as noted, supra. If the approach to interpreting the Constitution was still in terms of the strict legalistic formula exemplified in the Benner and Forsyth cases, supra, this court might be sitting illegally. However, one should remember Marshall's admonition in the famous case of McCulloch v. Maryland, 1819, 4 Wheat. 316, 17 U.S. 316 at page 407 and 421, 4 L.Ed. 579: "In considering this question, then, we must never forget, that it is *a constitution* we are expounding." * * * "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

This doctrine is re-echoed in a very recent case involving problems similar to the present case. See Reid v. Covert, 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148. A review of some of the language used by the majority in Reid v. Covert exemplifies Marshall's approach. The Reid case involved the question of whether, in accordance with the Constitution, the dependents of United States servicemen stationed overseas were subject to the jurisdiction of a court martial for criminal offenses committed overseas. The Court held that they were not subject to court martial jurisdiction regardless of the statute (article 211 U.C.M.J.), at least in capital cases. Later cases have held that there is no court martial jurisdiction of civilian dependents regardless of the type of offense committed.

See United States ex rel. Guagliardo v. McElroy, D.C.Cir., 1958, 259 F.2d 927; United States ex rel. Singleton v. Kinsella, D.C.1958, 164 F.Supp. 707; United States ex rel. Wilson v. Bohlander, D.C., 167 F.Supp. 791, Arraj, judge. The reasons for these rulings were far more compelling than the present case, as lack of jury trial and grand jury indictment are among a few of the constitutional safeguards lacking in a court martial.

At page 39 of 354 U.S., at page 1242 of 77 S.Ct. the opinion in Reid v. Covert, Justice Black states:

"It is urged that the expansion of military jurisdiction over civilians claimed here is only slight, and that the practical necessity for it is very great. The attitude appears to be that a slight encroachment on the Bill of Rights and other safeguards in the Constitution need cause little concern. But to hold that these wives could be tried by the military would be a tempting precedent. Slight encroachments create new boundaries from which legions of power can seek new territory to capture. 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon'. Moreover we cannot consider this encroachment a slight one. Throughout history many transgressions by the military have been called 'slight' and have been justified as 'reason-able' in light of the 'uniqueness' of the times. We cannot close our eyes to the fact that today the peoples of many nations are ruled by the military."

I am in full accord with this proposition of the law and would be the first to uphold it if I thought it applicable to the instant case. One must remember that there is a vast difference between a denial of a grand and petit jury to a civilian and denial for a limited period of that nebulous factor—a life-tenure federal judge. States are only admitted to the Union at infrequent and irregular intervals, the last being Arizona and New Mexico in 1912 and their birth pains are sometimes difficult.

At page 43 of 354 U.S., at page 1244 of 77 S.Ct., Reid v. Covert, supra, Justice Frankfurter, citing McCulloch v. Maryland, supra, and Hurtado v. People of State of California, 1884, 110 U.S. 516, at pages 530–531, 4 S.Ct. 111, at pages 118–119, 28 L.Ed. 232 states, in relation to the Necessary and Proper Clause of the United States Constitution (article I, section 8), which in itself is a justification for section 18 of the statehood bill, the following:

"The Court's function in constitutional adjudications is not exhausted by a literal reading of words. It may be tiresome, but it is nonetheless vital, to keep our judicial minds fixed on the injunction that 'it is a *constitution* we are expounding'. M'Culloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579. Although Winthrop, in his treatise, states that the Constitution 'clearly distinguishes the military from the civil class as separate communities' and 'recognizes no third class which is part civil and part military—military for a particular purpose or in a particular situation, and civil for all other purposes and in all other situations  *  *  *,' Winthrop, Military Law and Precedents (2d ed. 1896), 145, this Court, applying appropriate methods of constitutional interpretation, has long held, and in

a variety of situations, that in the exercise of a power specifically granted to it, Congress may sweep in what may be necessary to make effective the explicitly worded power. See Ruppert v. Caffey, 251 U.S. 264, especially 289 et seq., 40 S.Ct. 141, 148, 64 L.Ed. 260; Purity Extract & Tonic Co. v. Lynch, 226 U.S. 192, 201, 33 S.Ct. 44, 45, 57 L.Ed. 184; Railroad Commission of State of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 237, 66 L.Ed. 371. This is the significance of the Necessary and Proper Clause, which is not to be considered so much a separate clause in Art. I, § 8, as an integral part of each of the preceding 17 clauses. Only thus may be avoided a strangling literalness in construing a document that is not an enumeration of static rules but the living framework of government designed for an undefined future. M'Culloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Hurtado v. People of State of California, 110 U.S. 516, 530–531, 4 S.Ct. 111, 118–119, 28 L.Ed. 232."

This is further evidence that literalness is not the proper approach when dealing with constitutional problems in which no substantial rights are denied for indefinite periods. At page 50 of 354 U.S., at page 1248 of 77 S.Ct. of Reid v. Covert, Justice Frankfurter again states his views on proper constitutional interpretation and significantly he singles out American Insurance Co. v. Canter, supra, as a case which must be placed in its historical setting:

"Legal doctrines are not self-generated abstract categories. They do not fall from the sky; nor are they pulled out of it. They have a specific juridical origin and etiology. They derive meaning and content from the circumstances that gave rise to them and from the purposes they were designed to serve. To these they are bound as is a live tree to its roots. Doctrines like those expressed by the Ross case [In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581] and the series of cases beginning with American Insurance Co. v. Canter, 1 Pet. 511, 7 L.Ed. 242, must be placed in their historical setting. They cannot be wrenched from it and mechanically transplanted into an alien, unrelated context without suffering mutilation or distortion. 'If a precedent involving a black horse is applied to a case involving a white horse, we are not excited. If it were an elephant or an animal ferae naturae or a chose in action, then we would venture into thought. The difference might make a difference. We really are concerned about precedents chiefly when their facts differ somewhat from the facts in the case at bar. Then there is a gulf or hiatus that has to be bridged by a concern for principle and a concern for practical results and practical wisdom.' Thomas Reed Powell, Vagaries and Varieties in Constitutional Interpretation, 36. This attitude toward precedent underlies the whole system of our case law. It was thus summarized by Mr. Justice Brandeis: 'It is a peculiar virtue of our system of law that the process of inclusion and exclusion, so often employed in developing a rule, is not allowed to end with its enunciation and that an expression in an opinion yields later to the impact of facts unforeseen.' Jaybird Mining Co. v. Weir, 271 U.S. 609, 619, 46 S.Ct. 592, 595, 70 L.Ed. 1112 (dissenting). Especially is this attitude to be observed in constitutional controversies.

"The territorial cases relied on by the Court last Term held that certain specific constitutional restrictions on the Government did not automatically apply in the acquired territories of Florida, Hawaii, the Philippines, or Puerto Rico. In these cases, the Court drew its decisions from the power of Congress

to 'make all needful Rules and Regulations respecting the Territory * * * belonging to the United States,' for which provision is made in Art. IV, § 3. The United States from time to time acquired lands in which many of our laws and customs found an uncongenial soil because they ill accorded with the history and habits of their people. Mindful of all relevant provisions of the Constitution and not allowing one to frustrate another—which is the guiding thought of this opinion—the Court found it necessary to read Art. IV, sec. 3, together with the Fifth and Sixth Amendments and Article III in the light of those circumstances. The question arose most frequently with respect to the establishment of trial by jury in possessions in which such a system was wholly without antecedents. The Court consistently held with respect to such 'Territory' that congressional power under Art. IV, § 3, was not restricted by the requirement of Art. III, § 2, cl. 3, and the Sixth Amendment of providing trial by jury.

" 'If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States, was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice and provoke disturbance rather than to aid the orderly administration of justice. If the United States, impelled by its duty or advantage, shall acquire territory peopled by savages, and of which it may dispose or not hold for ultimate admission to statehood, if this doctrine is sound, it must establish there the trial by jury. To state such a proposition demonstrates the impossibility of carrying it into practice. Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition.' Dorr v. United States, 195 U.S. 138, 148, 24 S.Ct. 808, 812, 49 L.Ed. 128.

"The 'fundamental right' test is the one which the Court has consistently enunciated in the long series of cases—e. g., American Ins. Co. v. Canter, 1 Pet. 511, 7 L.Ed. 242; DeLima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041; Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088; Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128; Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627—dealing with claims of constitutional restrictions on the power of Congress to 'make all needful Rules and Regulations' for governing the unincorporated territories. The process of decision appropriate to the problem led to a detailed examination of the relation of the specific 'Territory' to the United States. This examination, in its similarity to analysis in terms of 'due process,' is essentially the same as that to be made in the present cases in weighing congressional power to make 'Rules for the Government and Regulation of the land

and naval Forces' against the safeguards of Article III and the Fifth and Sixth Amendments.

"The results in the cases that arose by reason of the acquisition of exotic 'Territory' do not control the present cases, for the territorial cases rest specifically on Art. IV, sec. 3, which is a grant of power to Congress to deal with 'Territory' and other Government property. Of course the power sought to be exercised in Great Britain and Japan does not relate to 'Territory.' The Court's opinions in the territorial cases did not lay down a broad principle that the protective provisions of the Constitution do not apply outside the continental limits of the United States. This Court considered the particular situation in each newly acquired territory to determine whether the grant to Congress of power to govern 'Territory' was restricted by a specific provision of the Constitution. The territorial cases, in the emphasis put by them on the necessity for considering the specific circumstances of each particular case, are thus relevant in that they provide an illustrative method for harmonizing constitutional provisions which appear, separately considered, to be conflicting."

This court believes that the "fundamental" or "substantial right test" is not only applicable to the territories when deciding cases involving the denial of constitutional rights, but is equally applicable in determining the jurisdiction of the District Court of the District of Alaska for the interim three-year transitional period authorized by section 18 of the statehood bill. It is a fact that denial of a life-tenure judge is not a "fundamental" and "substantial right" when viewed practically. See Justice Harlan in Reid v. Covert, 354 U.S. 1260, at page 75, 77 S.Ct. at page 1260:

"I think the above thought is crucial in approaching the cases before us. Decision is easy if one adopts the constricting view that these constitutional guarantees as a totality do or do not 'apply' overseas. But, for me, the question is *which* guarantees of the Constitution *should* apply in view of the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it. The question is one of judgment, not of compulsion. And so I agree with my brother Frankfurter that, in view of Ross and the Insular Cases [DeLima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041; Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074; Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088], we have before us a question analogous, ultimately, to issues of due process; one can say, in fact, that the question of which specific safeguards of the Constitution are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is 'due' a defendant in the particular circumstances of a particular case."

The rationale of the three justices quoted is the same rationale that this court will use in deciding the issue before it.

Let us examine the differences between life-tenure and none-life-tenure judges in the federal system to see if there is any "substantial" or "fundamental" difference between the two species. It is claimed that non-life-tenure judges, especially those in Alaska who are appointed for four-year terms, will consistently "have one eye cocked to the political effect of their decisions in order to obtain reappointment". The Supreme Court of the United States has refused to accept this view as it applies to the federal system and also as it applies to the state courts where judges usually hold office for less than life tenure. The Court's rationale is equally applicable in the present case. In Bridges v. State of California, 1941, 314 U.S. 252, 273, 62 S. Ct. 190, 198, 86 L.Ed. 192, Justice Black,

in speaking about adverse newspaper comment involving a life tenure federal judge, said:

"From the indications in the record of the position taken by the Los Angeles Times on labor controversies in the past, there could have been little doubt of its attitude toward the probation of Shannon and Holmes. In view of the paper's long-continued militancy in this field, it is inconceivable that any judge in Los Angeles would expect anything but adverse criticism from it in the event probation were granted. Yet such criticism after final disposition of the proceedings would clearly have been privileged. Hence, this editorial, given the most intimidating construction it will bear, did no more than threaten future adverse criticism which was reasonably to be expected anyway in the event of a lenient disposition of the pending case. To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor,— which we cannot accept as a major premise. Cf. Holmes, J., dissenting in Toledo Newspaper Co. v. United States, 247 U.S. 402, 424, 38 S.Ct. 560, 565, 62 L.Ed. 1186."

Again, in Pennekamp v. State of Florida, 1946, 328 U.S. 331, 349, 371–372, 66 S.Ct. 1029, 1038, 90 L.Ed. 1295, Justices Reed and Rutledge said:

"It is suggested, however, that even though his intellectual processes cannot be affected by reflections on his purposes, a judge may be influenced by a desire to placate the accusing newspaper to retain public esteem and secure re-election presumably at the cost of unfair rulings against an accused. In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice. For this to follow, there must be a judge of less than ordinary fortitude without friends or support or a powerful and vindictive newspaper bent upon a rule or ruin policy, and a public unconcerned with or uninterested in the truth or the protection of their judicial institutions. If, as the Florida courts have held and as we have assumed, the petitioners deliberately distorted the facts to abase and destroy the efficiency of the court, those misrepresentations with the indicated motives manifested themselves in the language employed by petitioners in their editorials. The Florida courts see in this objectionable language an open effort to use purposely the power of the press to destroy without reason the reputation of judges and the competence of courts. This is the clear and present danger they fear to justice. Although we realize that we do not have the same close relations with the people of Florida that are enjoyed by the Florida courts, we have no doubt that Floridians in general would react to these editorials in substantially the same way as citizens of other parts of our common country."

"In view of these facts any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an impossible one. Unless the courts and judges are to be put above criticism, no such rule can obtain. There must be some room for misstatement of fact, as well as for misjudgment, if the press and others are to function as critical agencies in our democracy concerning courts as for all other instruments of government.

"Courts and judges therefore cannot be put altogether beyond the reach of misrepresentation and misstatement. That is true in any case, but perhaps more obviously where the judiciary is elective, as it is in most of our states, including Florida. See Storey v. People of State of

Illinois, 1927, 79 Ill. 45, 52; 41 Harv.L.Rev. 254, 255."

In 1947 in Craig v. Harney, 1947, 331 U.S. 367, 376–377, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546, Justice Douglas said:

"A judge who is part of such a dramatic episode can hardly help but know that his decision is apt to be unpopular. But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Conceivably a campaign could be so managed and so aimed at the sensibilities of a particular judge and the matter pending before him as to cross the forbidden line. But the episodes we have here do not fall in that category. Nor can we assume that the trial judge was not a man of fortitude.

\* \* \* \* \* \*

"In the circumstances of the present case, it amounts at the very most to an intimation that come the next election the newspaper in question will not support the incumbent. But it contained no threat to oppose him in the campaign if the decision on the merits was not overruled, nor any implied reward if it was changed. Judges who stand for reelection run on their records. That may be a rugged environment. Criticism is expected. Discussion of their conduct is appropriate, if not necessary."

but not without adverse comment. See Justice Jackson in dissent, 331 U.S. at pages 396 and 397, 67 S.Ct. at page 1264, supra.

Thus, as the Supreme Court in the above cases has shown that it does not consider that the character of a judge will be substantially affected by political considerations when he does not hold office for life tenure, I find that a federal judge in Alaska who does not hold life tenure during Alaska's transitional period is not "substantially and fundamentally different" from his counterparts in the other states. It might be of interest at this point to note that Judge Wiig of the Hawaiian Federal Court, a territorial court, has sat on the Ninth Circuit Court of Appeals, in accordance with 28 U.S.C.A. § 292(a), on cases arising within the federal courts in the states, without challenge (see 69 Harvard Law Review 760 (1956)).

Before concluding, it is necessary to comment on another very interesting reason for upholding jurisdiction advanced by the government. The government claims that under the doctrine of Ames v. Colorado Central Railroad Co., C.C. Colo.1876, 1 Fed.Cas.No. 324 at p. 750, Alaska has properly adopted the Federal District Court for the District of Alaska as its state court pending the state courts' organization. With this I concur. See article 15, section 17, Alaska constitution. The government further claims that section 18 of the Alaska Statehood Act, supra, can be construed to delegate all federal judicial power to the state courts, namely, the present federal territorial courts. Testa v. Katt, 1947, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 is cited in support of this proposition. In the Testa case the Federal Emergency Price Control Act, section 205(e) and section 205(c), was in question. Under these sections, suits to enforce the criminal penalties contained in the act could be brought in either the state or federal courts. The Supreme Court of Rhode Island, on an appeal from a conviction under this act in a lower state court, held that a state need not enforce the penal laws of the federal government. The Supreme Court of the United States reversed this holding in toto.

The government's argument, based on the Testa case, has a fatal weakness. The Testa case was decided on a statute involving an emergency wartime situation, and cases of that nature should always be regarded with suspicion. Also, in the fact situation in the Testa case, the federal government had specifically, in the Emergency Price Control statute, supra, delegated its criminal power to the state court. Section 18 of the Alaska

Statehood Bill cannot be construed to mean that Congress intended to delegate all the federal judicial power to whatever courts the State of Alaska might adopt for its judicial system during the transitional period. In a case where all the federal judicial power is conferred on a state's courts, the statute conferring such power should be absolutely clear from ambiguity as to any other intent. Even if section 18 of the Alaska Statehood Act were unambiguous in its intent and it were clear that all the judicial power of the United States was to be exercised by the state courts for the transitional period, this court would have serious doubts as to its constitutionality for the following reason. In a state court such substantial rights as the prohibition against self-incrimination and the exclusion of illegally seized evidence, both of which are the rule in the federal courts, might not be available. Minneapolis and St. Louis Railroad Co. v. Bombolis, 1916, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 holds that in a civil case under the Federal Employers Liability Act, 45 U.S.C.A. § 51 et seq., tried in a state court by specific statutory delegation, a majority verdict is not a violation of the seventh amendment of the United States Constitution. It is obvious that in a criminal case the problems attendant on self-incrimination and illegally seized evidence would not be so easily disposed of. I wish to point out particularly, in this respect, that even then Alaska would be in a different position than those states, supra, which have statutes somewhat different from the federal Constitution and rules, since Alaska has virtually the same rules as the federal system. However, to hold that delegation is proper in Alaska could have grave consequences if it were later applied to New Jersey or Colorado. Besides, if the federal government can delegate all its judicial power to a state court, it should certainly be able to do the same to a federal legislative court, namely, to the District Court for the District of Alaska, as I have heretofore held in this opinion, such court having slight differences, if any, from an ordinary federal court.

Therefore, for the reasons set forth above, I find that the District Court for the District of Alaska has continuing federal jurisdiction during the transitional period when Alaska advances from territorial to full state status, and until the President, by Executive order, shall proclaim that the United States District Court for the District of Alaska is prepared to assume the functions imposed upon it, not to exceed three years after the effective date of the passage of the statehood act. Thus, the motions to dismiss are denied.